MALLEABLE IRON WORKS *vs.* PHŒNIX INSURANCE COMPANY.

An agent of an insurance company, authorized to procure applications for insurance, and furnished by the company with printed blanks therefor, containing interrogatories to be answered by the applicant, with regard to the condition of the property to be insured, has, as incidental to such power, authority to make all necessary explanations of the meaning and effect of the terms employed by the company in their interrogatories, and to agree with the applicant as to the terms which he shall employ, to express the facts stated by him in answer to the interrogatories.

Therefore, where such an agent, at the request of an applicant from whom he had solicited proposals for insurance, read to him the interrogatories and wrote in the application his answers, and while doing so, the question occurring, " Is a watch kept on the premises during the night?" the applicant answered "No," and then stated certain facts with regard to the employment of a man during part of the night, for most of the time, at an adjacent shop within the same enclosure, who would be likely to see if anything was wrong about the premises, upon which the agent remarked that he should consider the man to be a watchman till 12 o'clock, and the applicant remarking that he did not know how it would be considered, but would leave it to him, the agent wrote as the answer, "Watchman till 12 o'clock;" which application was forwarded to the insurance company by the agent without explanation, and a policy issued upon it, the company receiving no notice until after the insured property was burned, that the fact was not as stated in the application, and the insured not knowing until then that the answer was objectionable; on a petition in chancery, to procure the correction of the application in the above statement, and praying that the insurance company be ordered to pay the amount of the loss,—it was held, that the relief prayed for ought to be granted. [The chief justice dissenting.]

The agent, in filling out the application, having also inserted a statement that there was a watch-clock in the building, when in fact there was none, and the applicant had not so stated, but the agent supposing that a clock which he saw in the building was a watch-clock, so entered it without inquiry, the applicant being ignorant that such statement was contained in the application, until after the fire,—it was held, that the misstatement did not affect the case, having been made purely by mistake, and having become wholly unimportant in the view taken by the court of the matter of the watchman.

THIS was a petition in chancery, for the reformation of a contract of insurance, and praying for a decree that the respondents pay the sum of $5,000, the amount of the insurance. The facts were found by a committee.

The mistake in the contract was claimed to be in the answer to the 16th interrogatory of the application of the petitioners for insurance. The interrogatory was, " Is a

watch kept upon the premises during the night? Is there a good watch-clock? Is any other duty required of the watchman than watching for the safety of the premises? Is the building left alone at any time after the watchman goes off duty in the morning, till he returns to his charge at evening?" The answer was, "Watch on premises until 12 P. M. Watch-clock. Left from 12 P. M. to half past 5 A. M."

The application was signed by the petitioners, who stipulated therein that the answers to the interrogatories were "a just, full and true exposition of all the facts and circumstances in regard to the condition, situation and value of the property to be insured, so far as the same were known to the applicant and material to the risk."

There was in fact no watch-clock, and no watchman except a man employed to watch the furnaces in the annealing shop, a distinct building, but within the same enclosure, whose duty required him to be frequently, but not constantly, at and about the annealing shop, whenever the furnaces were kept up, (which was generally the case,) until 12 o'clock at night, and who, while so in attendance, would be likely to observe if anything was wrong about the premises.

The building insured was burned within the term of the insurance, having taken fire about half past 10 o'clock at night. The watchman had left that evening at half past 7 o'clock, the furnaces not being kept up.

The petitioners claimed that the incorrectness of the statement contained in the above answer, was owing wholly to the fault of one Houghton, the agent of the insurance company, who drafted all the answers contained in the application; and that he was acting therein as the agent of the respondents, so far as to affect them by his acts in relation thereto.

It was found on this point, that Houghton, previously to the 24th day of August, 1854, had applied to one Sturges, the agent of the petitioners, to have him procure an insurance on the property of the petitioners in the office of the respondents, and that some negotiations had been had between them on the subject; that on the day above mentioned, Houghton

called at the establishment of the petitioners, with a printed form of application for insurance, containing numerous interrogatories to be answered in writing by the petitioners, for the purpose of having the same filled out by Sturges; that Sturges told him that he was unacquainted with making out such applications, and that thereupon Houghton read the questions to him and wrote down his answers; that when completed it was hastily looked over by Sturges, who signed it and delivered it to Houghton for transmission to the office of the respondents at Hartford; that Houghton had several times examined and made surveys of the premises with a view to insure them, and was well acquainted with the situation and occupants of the same, and with the business carried on by the petitioners and their tenants in the various buildings on the premises; that Houghton, when writing the answers in the application, read aloud to Sturges the question, " Is a watch kept upon the premises during the night;" to which Sturges replied, " No," which answer was written down by Houghton; that Sturges then added, " We have a man who watches our annealing premises, and his duty requires him to be there from 9 o'clock at night to 12 o'clock at night, but not all the time; but during those hours he must come in; he is not a watchman for the building, but would be likely to see if anything is wrong about the buildings, and when the furnaces are run, he is obliged to be there;" that Houghton then observed that he should consider that this man was a watchman until 12 o'clock; that Sturges replied that he did not know how it would be considered, and would leave the matter to Houghton; that in consequence of this conversation, Houghton erased the word " No," from the answer, and wrote instead the words, " Watchman on premises till 12 o'clock," and as an answer to the last clause in the question, the words " from 12 P. M. to half past 5 A. M.;" that Houghton intended thereby to state substantially the representations of Sturges; that he did not read to Sturges that part of the question which relates to a watch-clock, but wrote the word, " watch-clock," in the application of his own accord, and from mistake and

misapprehension, supposing that a clock which he saw in the building, having the dial and form of a watch, was a watch-clock within the meaning of the question; that said application was not pursued by the petitioners, who gave notice to Houghton of their abandonment of it, before the policy was received by him from the respondents; but that the negotiations were resumed about a month after, when Houghton made out a new application in his own office, copying the answers contained in the former application, which he carried to Sturges, who looked it over hastily, signed it, and returned it to him, and upon which the policy in question was immediately afterward issued to the petitioners by the respondents, bearing date the 27th day of September, 1854.

With regard to Houghton's authority, it was found that he had been appointed by the respondents, their agent to receive and forward applications for insurance, and to make contracts of insurance for the term of ten days, and that the respondents had placed in his hands blank printed forms of application for insurance of the same kind with those filled out by him for the petitioners. It was also found that he had advertised in a weekly newspaper in Bridgeport, as the agent of the respondents, though there was no evidence that the respondents knew of the fact. Also that it was his general practice to fill out the blank forms of application, for parties applying for insurance, by writing therein the answers which they gave him orally.

It was also found that the answer in question was inserted in both the applications, without any intent to misrepresent the facts, on the part of either Houghton or Sturges, and that the statement with regard to the watch-clock was not known or supposed by the petitioners or by Sturges to be in the application, until after the fire had occurred; that Sturges knew at the time of signing both the applications, that the answer "watchman until 12 o'clock," was contained in both, but was misled as to the effect of the language, by the statement of Houghton, and his confidence in his knowledge on the

subject, and that neither the petitioners nor Sturges were aware of this misapprehension until after the fire occurred.

The case came to the superior court, holden in the county of Fairfield, in October, 1856, when it was reserved for the advice of this court.

*Dutton* and *Sturges*, for petitioners.

The mistake is expressly found to have been unintentional on both sides. It may therefore be corrected, so that the application shall contain the precise representation actually made. There could be no question on this point, if the officers of the insurance company had been acting in the matter instead of Houghton. 2 Root, 1. 22 Conn., 235, 247. 2 John. Cha., 585, 8. 17 Conn., 556. 18 ib., 101. 13 How., 57. 1 Sto. Eq. Jur., secs. 152, 158. 12 Eng. Law & Eq. R., 171. 1 Paige, 278.

The precise facts were known to Houghton, and notice to him was notice to his principal. 5 Hill, 101. 13 N. Hamp., 145. 3 Story, 659. Story on Ag., sec. 140. 11 Barb. Sup. Ct., 624. Ang. & Ames on Corp., sec. 305. 27 Eng. Law & Eq. R., 140. 22 Conn., 575.

The petitioners, in their application, stipulated only that the representations were true so far as the facts were known by them and material to the risk. Houghton had power, as agent of the respondents, to draft the application, and his mistake is therefore their mistake. He had also necessarily some discretionary power to agree with applicants as to how certain terms in their answers should be understood, and how certain facts should be stated ; so that his representations and stipulations are those of the respondents. It was within the scope of his authority to advertise his agency, and the respondents would expect him to do so, and are therefore to be presumed to have assented to his advertisement, although they may never have seen it or had actual knowledge what it was. And as he advertised as agent, with no qualification, he is presumed to have intended a general agency. Where an agency is proved, the law always ·

presumes a general agency. 12 Ad. & El. N. S., 856. Sto. on Ag., sec. 127. 33 Maine, 169.

The respondents knew that Houghton was accustomed to fill up applications for persons desiring insurance, and accepted from him applications so filled up. By permitting this, they authorized it. 4 Cow., 645, 660. Sto. Ag., sec. 80, 250. 2 Denio, 246. 1 Met., 193. 23 Wend., 18, 260. 5 Foster, 169.

If the mistake can be corrected, it is not necessary to the right of recovery that the statement made by the petitioners' agent should have been entirely true, so long as no misrepresentation was intended. It was not material to the risk, and therefore not a warranty. 14 Eng. Law & Eq., 524. 3 Comst., 122.

If the court sustains the bill for any purpose, it will grant complete relief. 1 Sto. Eq. Jur., sec. 75. 3 Conn., 135. 7 Conn., 543. 9 How., 390.

*Hawley* and *W. D. Shipman*, for respondents.

In order to entitle a party to the reformation of a written instrument, by supplying an alleged omitted part, the omitted portion must be material to the contract, and clearly proved to have been definitely agreed upon by the parties at the time of making the contract. *Motteux* v. *London Ass. Co.*, 1 Atk., 545. *Henkle* v. *Royal Exch. Ass. Co.*, 1 Ves., 317. *Lyman* v. *U. S. Ins. Co.*, 2 Johns. Ch., 630. *Lyman* v. *Boston and Marine Ins. Co.*, 2 Cranch, 419. *Andrews et al.* v. *Essex Fire and Marine Ins. Co.*, 3 Mason, 6.

In this case, no fact whatever was omitted by mistake. It is expressly found that the agent of the petitioners, as well as the agent of the defendants, knew that the words "watch on the premises till 12 P. M.," were in the application.

The conversation which passed between the agent of the plaintiffs and the agent of the defendants, prior to the signing of the application, was not intended to be any part of the latter. It furnishes no certain rule by which the court can be guided in rectifying the contract. The most that can be claimed, is that the agent supposed an absurd con-

struction, contrary to the fact stated in the answer, might be put upon the answer itself. No case can be found that would justify a court of equity in changing an instrument, to meet the vague and uncertain notions which parties might entertain at the time of executing it, as to the construction of its plain and simple provisions. Infinite mischief would follow the establishment of such a doctrine. *Shelburne* v. *Inchiquin,* 1 Br. Ch. Ca., 338, 357. Paley on Agency, 203.

A party seeking to reform a written instrument, on the ground of mistake, must show that it did not occur through gross negligence on his part. 1 Sto. Eq. Jur., sec. 105.

The written answers alone were the basis of the contract, and nothing was in contemplation by either party, when it was made, except what appeared in the application itself. The respondents, in deciding to insure the property, acted wholly on the application itself, and in ignorance of any representations of Houghton as to the meaning of the terms employed by the petitioners, and in ignorance of all facts pertaining to the matter, not stated in the application.

Houghton was a special and not a general agent. This appears from the finding. He was the defendants' agent to receive and transmit the proposals of the applicant. He was not their agent to dictate, construe, or write the answers of the plaintiffs. Story on Agency, secs. 17, 18.

Houghton having no power to fix the terms or construe the meaning of this contract, any declarations, representations or knowledge of his, can not affect the defendants. Paley on Agency, 194, 204. Story on Agency, secs. 127, 133, 135. *Schimmelpennich* v. *Bryan,* 1 Pet., 264. *Fenn* v. *Harrison,* 3 T. R., 757.

But if this application is amended, it is difficult to see how the petitioners can recover, as they have not kept their engagement as they understood it.

ELLSWORTH, J. The petitioners ask, by their bill, that the superior court will reform a certain policy of insurance, and order the respondents to pay $5,000, which they say is due them, for the loss of their iron works. The error which

the court is asked to correct, consists in the answer, as it now stands, to the 16th interrogatory in the proposals. That answer says that there was a watch upon the premises until 12 o'clock, P. M., and likewise a watch-clock. This answer, or one just like it, we held in the late case of the Glendale Woolen Company, 21 Conn., 19, (being expressly made a part of the policy,) to be in the nature of a warranty, and that, if untrue, it would render the policy void. Fearing this result at law in a suit on the policy as it now reads, the petitioners seek a correction and reformation of this part of the policy. They say the policy is incorrect, inasmuch as it does not express the contract as it was made ; that the answer in question was not given as it was written and is now understood, and that such was the course pursued by the agent of the respondents, at the time, that the petitioners ought not to be injured by the mistake, and the respondents ought not to object to the correction.

On the one hand, it is insisted that the insurance company have made no other contract of insurance than the one in writing, and if Houghton, their agent in Bridgeport, has made another and different one, he made it for himself, and had no authority to make it for the company. On the other hand, it is insisted that Houghton was the general agent of the company for all the purposes of insurance in Bridgeport, and could bind the company in the premises as fully as any general agent whatever; and that, at any rate, if he was clothed with only a limited authority to bind the company, such limitation can not affect third persons like themselves, who, without any knowledge of such limitation, have obtained insurance through such agent.

These respective claims have led counsel to examine many cases in the books, upon the point to what extent insurance agents abroad can be held to represent the companies for which they act; when they bind their principals, and when they only bind themselves. Here is a field of wide extent for doubt and litigation, and many cases may be found illustrating the rule as it is claimed on the one side and on the other; and yet, after all, this case resolves itself into a ques-

tion of fact more than of law, as is established and very well illustrated in the case of *Sheldon et al.* v. *The Hartford Insurance Company*, 22 Conn., 235, and the case of *Boughton* v. *The A. M. L. Ins. Co.*, tried on the present circuit at New Haven.

The court do not deem it important to travel over this entire field, since a majority of us are satisfied, taking the facts as they are found, that Houghton did, in this instance, sufficiently represent the company, when he obtained proposals from the petitioners and remitted them to his principals at Hartford, to bind them, by his agreement or explanations given at the time. Dunlop's Paley on Agency, 192, 200. *Sandford* v. *Handy*, 23 Wend., 260. *Nelson* v. *Cowing*, 6 Hill, 336. Story on Agency, sec. 134 *Devendorf* v. *Beardsley*, 23 Barb., 660.

It is found that, about the first day of July, 1854, the insurance company appointed Houghton to be their agent, with power, among other things, to receive and forward applications for insurance, and for that purpose they furnished him with printed blank proposals, of which the present is one, containing the proper questions to be answered by the applicant. With this list of interrogatories Houghton applied to Mr. Sturges, the petitioners' manager and agent, to induce him to get his company's works insured in the office of the respondents. In reading the interrogatories over to Mr. Sturges, when he came to the 16th, Mr. Sturges replied, " No watch on the premises," and it was so entered by Mr. Houghton. Soon after, Mr. Sturges added, " We have a man who watches our annealing premises, and his duty requires him to be there at night from nine o'clock to twelve, but not all the time; but during these hours he must come in; he is not a watchman for the building, but will be likely to see if anything is wrong about the buildings, and when the furnaces are run, he is obliged to be there." Upon this, Houghton observed that he should consider that this man was a watchman until twelve o'clock, and Sturges replied, " he did not know how it would be considered, that he left the matter to Houghton,"

who thereupon erased the word " No," and wrote " Watchman on the premises till twelve o'clock." We think this interpretation or conclusion, if not an agreement by Houghton, (it being an essential part of the proposals and the very ground-work of the insurance to be obtained,) was within the authority given to him as the respondents' agent, when he was intrusted with those printed blanks, in order to perfect applications for insurance. He was expected to make use of just this list of questions, and to give to the applicant for insurance any necessary information or explanation touching the meaning of the proposals. The questions on this paper are very numerous and somewhat indefinite, and to answer them intelligently and fairly must often require some information and preliminary understanding. We think there must be an incidental power in the agent, adequate to the explanation of the description of property which is to be insured, or the meaning of words and phrases, and the application of answers to the subject matter. We do not say that an insurance agent is of course a general agent with no limitation, but only that he is, in certain cases, clothed with an incidental power to perfect that which is committed to his care. The agent was to obtain and forward a perfect application. It was within the sphere of his duty to explain the questions and decide for himself and the *bona fide* applicant, what was a satisfactory answer, and how the answer should be applied to the subject. In such a case, the agent can not be said to make the insurance himself, but his principals do it at the home office, obtaining only through him the necessary information. Suppose the secretary of the company had visited Bridgeport to solicit insurance, and among others had called on Mr. Sturges, and handed him these questions to be answered, and having made himself familiar with the premises of the petitioners, had agreed that the man who watches the annealing shop should be considered and held a watch on the premises until twelve o'clock, and had himself explained and filled out the proposals as Houghton did,—would not the company be concluded ? We think they would.

Let us examine and see, if in all fairness and justice, a local agent is not clothed with such incidental power. The 14th question is, " How are the several stories occupied ? " A full and exact answer to this question might require a lengthy and complex recital of facts. Can not the agent agree to an abridged answer, which shall be held to be sufficient? In answering some of the interrogatories in the paper, it may not be easy to state exactly what the facts are, and how they would be understood if answered. In order to get the risk, may not the agent explain, and agree how the thing shall be considered to be, keeping always within the limits of the power which he is to exercise ? The 17th question is, " Are there casks in each loft ? " may not the agent explain this as equivalent to tubs and cisterns ? The 18th question is, " Is smoking or drinking of spiritous liquors allowed on the premises ? " Now what are the premises exactly ? Can not the agent agree how it shall be considered, or must this be left an open question, or no insurance be had, without the hazard of a law-suit ? The 19th question is, " Are the buildings and machinery both owned by the applicant, and is there any other person interested in the property ? " These questions are, sometimes, not so easily answered of a certainty. May not the agent agree what, on the whole, is a satisfactory answer to them ? The same may be said of several other questions. If agents, who are furnished with exact and printed blanks, are not to be allowed to say a word by way of information or explanation, when fairly and honestly attending to their appropriate business, which shall attach to the contract of insurance and bind the company, there is great danger that injustice will be done to the honest and confiding applicant ; and the sooner it is known that the agent only is bound in such instances, the better for the community. Here, the question was, what was to be understood by the answer, " a watch on the premises." The facts were truly stated to the agent, who was appealed to to say how these facts should be considered, and he decided that they amounted to a watch, or should be held to be so ; and

now in fairness and justice the company should be bound by that conclusion of Mr. Houghton.

As to the watch-clock, it is found, strange as it may seem, that when Mr. Houghton read to Mr. Sturges the 16th question, he did not read anything about the clock, but that Mr. Houghton put that answer in himself, because he saw a clock of that character, as he thought, standing in the room. Assuming this, then, we pass over this part of the answer as comparatively unimportant, for we do not perceive that it was made a part of the proposal for insurance, except by sheer mistake, and at best is not material if the matter of the watch itself is to be held as we have stated.

We are persuaded that not unfrequently insurance companies are sufferers from carelessness, unfairness and craft on the part of the insured, and there may well be jealousy and distrust, when it is asked to reform the contract after the loss has taken place. Were we investigating the alleged mistake ourselves, we should proceed with much caution, and require clear and ample evidence before we should yield assent in such a case. But a case may be made out. We know mistakes do occur which are not discovered until there is an occasion to seek redress on the policy. A majority of the court feel constrained to decide, upon the facts established in the case before us, that there was a clear and palpable mistake or misunderstanding, and that the policy must be reformed.

We take this occasion, however, to say, that there are but few institutions more conducive to the safety and prosperity of the people, than insurance companies when well conducted, as we believe they are in this community. They should be fostered and sustained by an equal and impartial administration of justice, when brought in conflict with persons who claim indemnity upon contracts of insurance. There should be no prejudice against them, as is sometimes the case, for protecting and defending themselves against what they believe are unfounded and fraudulent claims; and so, on the other hand, they should know that there is danger from the multiplication and rivalry of agents in every city,

town and village throughout the land, some of whom are inexperienced, and not always as careful and exact as they should be. Agents should never obtain insurances for the company without authority, nor be allowed to hold themselves out by advertisements, notices, or a course of conduct, as possessing general powers, when their powers are only limited and special. Herein is great danger that injustice will be done to persons obtaining insurance, who are inexperienced in the business, and place full confidence in the word of an insurance agent, accredited as he is by his public appointment.

For the reasons herein assigned, we are of opinion that the plaintiffs are entitled to the relief for which they ask, and so we advise the superior court that the policy be reformed, and a decree be passed that the plaintiffs recover the five thousand dollars and interest.

In this opinion HINMAN, J., concurred. STORRS, C. J., dissented.

Decree for petitioners.