## The North American Fire Insurance Company v. George B. Throop.

*Parol evidence to explain written contracts.* Evidence of the circumstances under which a written contract was executed, or of the sense in which equivocal words in a written contract were used, for the purpose of explaining the contract, is admissible only when words have been employed which are ambiguous or equivocal in meaning.

*Policy of insurance: Description of property.* A description in a policy of insurance of the subject insured in these words:—"the stock, lumber and goods manufactured and in process of manufacture in said building," will not cover property in the yard adjoining the building. The words "in said building" will be held to qualify the description of all the property insured, and not merely that "in process of manufacture;" and therefore, evidence that the agent of the company was told at the time the policy was issued, that insurance was wanted "on the lumber outside as well as inside the building" is inadmissible; especially when the subject insured is laid in the declaration as "on lumber and stock of felloes, poles, bows and shafts manufactured, and in process of manufacture, contained in the above named building."

*Evidence: Lost contract: Proving contents: Conversation preliminary to execution.* When the genuineness of a paper—an application for insurance—is in controversy, the genuine paper having been drawn by the agent of the company, and the statements to be embodied in it having been communicated by the applicant to the agent, the conversation between them at the time of putting it in writing is admissible as bearing on the question of the actual contents of the paper.

*Examination of witness: Proving signature.* A witness cannot be compelled to answer whether a signature shown to him is his, unless he is permitted to examine the paper to which it is appended.

THE NORTH AMERICAN FIRE INSURANCE CO. *v.* THROOP.

*Insurance: Application: Materiality: Representation: How proved.* When an application is reduced to writing by the insurer, upon the oral statements of the applicant, and the application is made the basis of the contract for insurance, the insurer is under a strong moral obligation to draft the paper so that it shall assure to the party the protection for which he pays; and when a controversy arises upon the truthfulness of such an application as a representation or a warranty, and statements alleged by the insurer to be essential to a true representation are omitted, and he seeks to avoid the contract on that ground, parol evidence is admissible to show that the facts were truly stated, and that the conduct of the insurer led the applicant to believe that such as were omitted in the application were immaterial; and the same rule will apply and bind the insurer when the papers are drawn and the insurance effected by an agent.

When the attention of an applicant for insurance is directed by an interrogatory to incendiarism as a risk to which the property may be exposed, and the evidence shows that an attempt had been made to set fire to it, which the applicant does not state to the insurer, it is error to submit to the jury the question whether an attempt to fire the building was material to the risk; and it would also be error in a case where the truthfulness of the application is made the basis of the contract, to instruct the jury that if such information had been given to the insurer as would put him upon inquiry as to the attempt to burn the building, that would justify the insured in his failure to communicate the facts within his knowledge.

*Heard October 19, 1870. Decided January 4.*

Error to Lenawee Circuit.

This was an action of *assumpsit*, upon a policy of insurance, brought by George B. Throop, in the Circuit Court for the County of Lenawee, against the North American Fire Insurance Company, of the city of New York. The amount and property insured was stated in the declaration to be: — "five hundred dollars on his three-story brick and frame building, situated on the east side of South Main street, near the Michigan Southern and Northern Indiana Railroad Company, in the city of Adrian, used as a steam bending factory, and two thousand five hundred dollars on lumber and stock of felloes, poles, bows and shafts, manufactured and in process of manufacture, contained in the abovednamed building."

The defendant pleaded the general issue, and gave notice that the policy of insurance "was made and issued upon an application therefor, signed by said plaintiff, and made by the terms of said policy, and said application, a part of

said policy and a warranty, and that in and by said application the plaintiff represented and warranted, amongst other things:      *      *      *      *      *      *      *      *

"10th. That said property was mortgaged to the amount of two thousand dollars, and no more.

"11th. That the only mortgage on said property was to Topliff & Day.

"12th. That said plaintiff had no reason to believe that the property was in danger from incendiarism.

"And the said defendant will further give evidence and show that each and every of said representations was untrue, and each and every of said warranties broken."

The cause was tried by a jury, who under the charge of the court found a verdict for the plaintiff for $3,570 50, and a judgment was entered thereon which is brought into this court by writ of error. The questions for review upon the admissibility of evidence, and the charge of the court, are fully stated in the opinion.

*Ashley Pond*, for plaintiff in error.

*A. L. Millard* and *G. V. N. Lothrop*, for defendant in error.

COOLEY, J.

This record is brought before us by writ of error for a review of certain rulings by the Circuit Court on the trial of an action upon a policy of insurance. The policy, it appears, was not produced on the trial, and was claimed to have been destroyed by the fire which burned the property insured; and parol evidence was therefore given of its contents.

The declaration averred that the insurance company, the defendants below, insured the plaintiff "against loss or

damage by fire to the amount of three thousand dollars; that is to say: five hundred dollars on his three-story brick and frame building, situated on the east side of South Main street, near the Michigan Southern and Northern Indiana Railroad Company, in the city of Adrian, used as a steam bending factory, and two thousand five hundred dollars on lumber and stock of felloes, poles, bows and shafts manufactured, and in process of manufacture, contained in the above named building." The plaintiff having given evidence of the loss of the policy, testified to its contents as follows: "The written part of the policy was, as near as I can remember, as follows: The rate was three and a half per cent; the whole consideration one hundred and five dollars. The whole amount insured was three thousand dollars, which was distributed as follows: five hundred dollars on three-story brick and frame building, situate on South Main street, near the Southern Railroad track and adjoining. It was on the east side of Main street. It stated that the building was used for steam bending works. There was also two thousand five hundred dollars insurance in said policy on the stock, lumber and goods manufactured and in process of manufacture in said building. The stock consisted of bows, poles, felloes, shafts, etc. I don't remember whether these items were specified in the policy, but they were in the building." Having thus stated the terms of the contract as near as he professed to be able to do so, the plaintiff proceeded to give the particulars of the loss. After stating the value of the goods manufactured and in process of manufacture, in the building at the time of the fire, he proceeded to say: "I also had a hundred thousand of lumber which cost me about twenty-four dollars per thousand, and was worth about thirty dollars. About one-third of it was in the lower story of the building, the rest in the yard."

The plaintiff, it appears, claimed that the lumber in the yard, as well as that in the building, was covered by the policy. To establish this claim the following questions were put to the plaintiff while on the stand, and the subjoined answers elicited.

"*Question*—Did you show Collyer [the agent who took the insurance] the lumber outside as well as inside the building, and did he examine it for the purpose of insuring?

"*Answer*—He was down there several times, and looked the place over two or three times, outside as well as inside the building, and took its general surroundings.

"*Question*—What did you state to him you wanted insurance upon?

"*Answer*—On the whole property; on the lumber outside as well as inside the building. It would be outside one day and inside the next."

These questions and answers were objected to as incompetent, but the objections were overruled.

We have been unable, after considerable reflection, to discover any ground upon which the rulings in admitting this evidence can be sustained. It is conceded that it was not competent to extend or enlarge by parol the terms of the written contract, but it is argued that the case comes within the principle of those cases of which *Facey v. Otis, 11 Mich., 213,* affords an example, in which parol evidence has been received to show the circumstances under which a contract has been made, for the purpose of explaining its contents where ambiguous; or of another class of decisions like *Malleable Iron Works v. Phœnix Insurance Company, 25 Conn., 465,* in which it has been held that where parties come to an agreement concerning the meaning of equivocal words employed in their contracts, the court will construe them according to the understanding arrived at.

To make either class of decisions applicable, we must

first be able to perceive that words have been employed which are ambiguous or equivocal in meaning. The argument for the assured is, that in the written policy, as stated in his evidence, the words "in said building" refer, or may refer, to the words "in process of manufacture" only, leaving the words "stock, lumber and goods manufactured" to stand by themselves; in other words, that while the insurance on goods in ·process of manufacture is restricted to those in the building, the stock, lumber and goods manufactured are insured without reference to their actual locality. And if there can be any doubt concerning the natural construction of the words being as here claimed, then, it is further argued, one or the other of the principles before mentioned is applicable, and the insurance must be extended to the lumber if such appears to have been the understanding the parties had of their contract at the time they made it.

But we think any construction of the written portion of the policy, as given by the plaintiff in his evidence, which will confine the reference of the words "in said building" to the goods in process of manufacture, is forced and unnatural, and so opposed to any meaning of the parties to be gathered from the natural and most obvious construction of their language as to strongly impress one that thus construed, the contract would, in effect, be a new one, differing materially from the one the parties attempted to express by the written instrument. No reason was suggested on the argument, or now occurs to us, why the scope of the words "in said building" should or could be thus restricted, beyond the circumstance that they stand in immediate juxtaposition to the words "in process of manufacture," and were remote from the words "stock, lumber, and goods manufactured." But this is obviously a very unimportant and quite accidental circumstance. In any

enumeration of property insured in the building, some class of it must be mentioned last, but the qualifying words which follow, cannot without violence to the language be restricted exclusively to the article last specified, where, as in this case, all are so mentioned and connected as to make the restriction plainly applicable to all. If the purpose was to confine the insurance to the property in the building, it would be difficult to choose more apt and proper words than are here employed to indicate that purpose; while if a more restricted application of the words " in said building" were designed, the parties, it seems to us, have not only failed to express their meaning, but have expressed the opposite.

But whatever might be the construction of the policy, as it is given by the plaintiff in his evidence, there is no room for doubt or for a suggestion of doubt upon it as set forth in the declaration. There the insurance is stated to have been "on lumber and stock of felloes, poles, bows and shafts, manufactured and in process of manufacture, contained in the above-named building." No construction of this sentence, whether upon grounds of strict grammatical accuracy or of ordinary use, can fail to apply the words " contained in the above-named building," at least to the " stock," if not to both the " lumber and stock," which are apparently its subjects; though if restricted in its reference to the stock alone, it would be fatal to the argument which the plaintiff makes on the evidence, where he excludes from the qualifying words everything but the goods in process of manufacture; all the others, according to his claim, being covered by the insurance, whether in the building or not. The result would be that the plaintiff, if he construes the policy rightly, must fail because it varies from the contract declared upon. But in our opinion he does not construe it correctly. The contract

declared upon, as well as that proved, covers only the lumber and stock in the building; and its terms are too plain to admit of parol evidence upon any theory that they need or will admit of explanation giving them a broader scope and meaning.

The second alleged error which is relied upon, relates to the admission of evidence touching incumbrances upon the property covered by the insurance. To show the materiality of this it is necessary to state that the defendants put in evidence an application, purporting to be signed by the plaintiff, and which their witness testified was the application on which the risk in question was taken. This application contained the following questions and answers:

" *Question*—Is there any incumbrance on the property?

" *Answer*—Yes.

"*Question*—If mortgaged, state the amount, and to whom?

" *Answer*—Two thousand dollars; Topliff & Day."

Appended to this application was the following undertaking: "And the said applicant hereby covenants and agrees to and with said company that the foregoing is a just, full and true exposition of all the facts and circumstances in regard to the condition, situation and value of the property to be insured, so far as the same are known to the applicant and material to the risk; and the same is hereby made a condition of the insurance and warranty on the part of the insured."

The plaintiff denied signing this application, but testified that he signed a different one, to which an agreement was appended, which, so far as is material to be here stated, was as follows: "And the said applicant covenants and agrees with said company that the foregoing is a just, true and full exposition of all the facts and circumstances in regard to the condition, situation, hazard and value of the property to be insured, so far as the same appertain to the

22 mich.—20.

risk." The plaintiff was then allowed, under objection, to give the following evidence concerning incumbrances upon the property: "I suppose I had told Collyer [the agent] about the incumbrances as much as eight or ten times. He and I boarded at the same house, and he kept at me all the time to insure with him. He knew just as much about it as I did. I told him about the mortgages to Hunt and to Topliff & Day, and a mortgage to W. H. Stone, on which there was nothing due or payable. I told him there was from two hundred and fifty to three hundred dollars due on the Hunt mortgage, and that it was originally made for five hundred dollars. I told him the Topliff & Day mortgage was originally for two thousand five hundred dollars, and that it had been reduced to from two thousand to two thousand two hundred dollars. These were about the amounts that were due on the property then. He said it would make the application look bad to put in all these mortgages, while there was so little due on them."

The objection to this evidence was that it had a tendency and purpose 'to vary the written contract, in which the plaintiff covenanted that there was only one mortgage of two thousand dollars on the premises, and would in effect exempt from the covenant another mortgage of two hundred and fifty dollars or more, which the plaintiff knew about and had in mind when the application was made, and also any sum over two thousand dollars which might be owing on the mortgage to Topliff & Day.

We are of opinion that at the time this evidence was offered and received, it was competent and proper evidence. The defendants had put in a paper which they claimed was the application which the plaintiff had signed. The plaintiff denied having signed it, but admitted having subscribed a different one, which was not produced. The question what were the contents of the application actually made, and

what covenants it contained, was therefore a matter of dispute, and as bearing upon this, the conversation between the parties concerned in putting it in writing was or might be of material consequence. If the agent drew the application, and was fully informed of all material facts, the inference that these facts, so far as was customary, or as the blank form used by the company required, would be correctly set forth in the application, was very natural and strong. The plaintiff, we think, was entitled to the benefit of this inference, if the jury should be of the opinion that he was truthful, when he testified that the paper produced was not the one he signed.

If, therefore, this part of the case rested exclusively upon the action of the court in admitting this evidence, we should not find it important to go farther, and should hold the ruling to be unexceptionable. But the circuit judge, as we understand his charge to the jury, instructed them, in substance, that even though the application produced by the defendants was the one signed by the plaintiff, yet if the defendant's agent filled out this application, and the plaintiff had previously given him full and correct information concerning the incumbrances, then the failure to specify the Hunt mortgage in the application would not vitiate the policy or preclude a recovery. This we understand to be the effect of his charge and refusals to charge so far as they concern the point now under discussion.

The question then is this: When the party applying for insurance states in his application that the property was incumbered to a certain amount only, and then covenants that the application is a just, full and true exposition of all the facts and circumstances in regard to the condition, situation and value of the property, so far as he knows and as they are material to the risk, and makes the same a condition of the insurance and a warranty on his

part, and it then turns out that the incumbrances are untruly stated, is it any answer to a claim of forfeiture of the policy that the insurer was correctly informed concerning the incumbrances at the time of taking the risk, and prepared the application himself after such information was given him?

The question thus stated is one which has been the subject of much legal controversy, and it cannot be denied that there are many cases which fully sustain the position for which the plaintiffs in error contend. *Jennings v. The Chenango County Mutual Ins. Co., 2 Denio, 75* is a leading case of this character. In that case the application was so worded as to require a statement whether there were any buildings within ten rods of the one to be insured, and it was filled up in such a way as not to show any. It appearing that in fact there was a building within that distance, the court were of opinion that it was not competent to show by parol that the agent of the insurers prepared the application, and that he was fully informed of the location of such other building at the time, and framed the application to his own satisfaction. *Brown v. The Cattaraugus Co. Mutual Ins. Co., 18 N. Y.* is to the same effect, and many others might be mentioned. Some of these cases appear to assume that there is something peculiar in the contract of warranty contained in a policy of insurance, which should distinguish it from other warranties, though they do not undertake to point out specifically what this peculiarity consists in. A contract of warranty does not, in general, unless such is the plain intent of the parties, extend to defects palpable to the senses, and within the observation of the parties when the contract was made.— *Schuyler v. Russ, 2 Caines, 202 ; Long v. Hicks, 2 Humph., 305 ; Dillard v. Moore, 2 Eng., 166 ;* but each of the cases above cited refused to apply this rule to a warranty in an

insurance policy, though in the case in *Denio*, the court very justly say: "It may be difficult to assign a satisfactory reason for a distinction in this respect between a warranty in a policy of insurance and one upon a sale of property." And see *Ang. on Fire and Life Insurance*, § *143;* and remarks of Nelson, Ch. J. in *Turley v. N. A. Fire Ins. Co., 25 Wend., 374.* Indeed it would seem that if any distinction was to be made it should, for very obvious reasons, not be one discriminating in the direction which these cases appear to. The warranties required of applicants for insurance are against those things which are supposed to increase the risk, but there is no definite line which can always be drawn between what will and what will not have that effect, and sometimes a fact which is material may be so in such slight degree as to make its omission appear to the parties to be unimportant. A building, for instance, located within ten rods of another, may or may not have a tendency to increase perceptibly the risk of injury to the latter by fire. If both were of wood, and within a few feet of each other, the hazard might be greatly increased by the proximity; but if both were small structures, built of brick or stone, and situated a considerable distance apart, an insurer would not be likely to make any difference in his rates because that distance fell a little short of ten rods; and both parties might well suppose, in such a case, that an inquiry for buildings within ten rods would not call for a mention of such a structure, which, if mentioned, would not be regarded. So, if one were to ask insurance to nearly the full value of a building, the question of incumbrance upon it might be very material, when if he sought a policy for five hundred dollars only on a building worth ten thousand, the question whether the property was or was not mortgaged for some small sum, would not in the least affect the premium demanded.

Incumbrances are important, *first*, as bearing upon the extent of interest which is to be covered by the policy; and *second*, as showing how far the insured is interested in protecting it against destruction, or, on the other hand, in suffering it to be destroyed; and when the value of the property is so far in excess of both incumbrance and insurance as to make it to the interest of the insured to guard and protect the property with constant vigilance, the fact of incumbrance, though material in a legal sense and in slight degree, may nevertheless well be treated by the parties as unimportant when the contract of insurance is being agreed upon.

In all these cases, where the particular fact called for by an interrogatory is unimportant or nearly so, under the circumstances of the particular case, it is very easy for the assured to be led to suppose that such interrogatory, which he knows was prepared generally and for the purpose of meeting the cases in which it would be of practical importance, was not to be relied upon in his own case; and if the insurer himself, or his agent, drafts an answer to such interrogatory, in which he treats it as immaterial and does not observe strict accuracy in his statement of facts, the assured might well suppose he would be thought captious and hypercritical if he should insist upon answers exactly correct, when the party seeking the information, and who alone was interested in it, was satisfied with statements less accurate, and which, with full knowledge of the facts, he had written out to suit himself.

We cannot, in construing a contract of fire insurance, overlook the customary manner in which such contracts are obtained. The form which the negotiation apparently assumes is this: The one party applies to the other for insurance, and agrees in his written application that the facts material to the risk are as therein set forth. The

other party issues the policy, assuming the risk on condition that the facts are as represented. The appearance, therefore, is of two parties meeting on equal terms, who might be supposed to frame their respective propositions and undertakings with a view to the protection of their own interests. But in fact, both application and acceptance are usually drawn by the insurer himself, or his agent, into whose hands, as a person understanding the business thoroughly, and therefore knowing what should and what should not be inserted in the writings, the assured places himself and his interests. We do not undertake to say that this is always the case, but this course is sufficiently general to warrant our taking notice of it as usual and customary. The insurer occupies the position of an expert who assumes to understand what the papers should contain. Being an expert he undertakes to draw a contract between himself and another person who will generally be ignorant of the exact requirements; and under such circumstances the insurer is under a strong moral obligation to so draft the papers as to make them assure to the opposite party the protection for which he pays his money. If there has been no fraud and no concealment, but a full and frank statement of all the facts, and the insurer has framed the papers to suit himself, in view of all the circumstances, the law would justly be subject to the reproach of favoring deception and fraud, if the insurer was allowed to retain the premium, and at the same time repudiate the contract, for his own failure to make its recitals correspond exactly with the facts.

In this case it is conceded that the oral answer made to the inquiry about incumbrances, mentioned the large mortgage, but it is disputed that it specified the small one also. The plaintiff claims that he gave the agent full information on the subject, and insists that if there was

any failure to mention it in the application, it was for reasons operating exclusively upon the mind of the agent, and not affecting his own action. We think evidence of these facts was competent. Its purpose was, not to vary or contradict the contract of the parties, but to preclude the party who had framed it from relying upon incorrect recitals to defeat it, when he himself had drafted those recitals, and was morally responsible for their truthfulness. —*Plumb v. Cattaraugus Mutual Ins. Co., 18 N. Y., 394; Rowley v. Empire Ins. Co., 36 N. Y., 550,* (over-ruling earlier New York cases); *Anson v. Winnesheik Ins. Co., 23 Iowa, 84; Malleable Iron Works v. Phœnix Ins. Co., 25 Conn., 465; New England F. & M. Ins. Co., v. Schettler, 38 Ill., 166; Hough v. City Fire Ins. Co., 29 Conn., 10; Patten v. Farmers' Fire Ins. Co., 40 N. H., 383; Columbia Ins. Co., v. Cooper, 50 Penn. St., 331; Olmstead v. Ætna Live Stock, etc., Ins. Co., 21 Mich., 246.* And we think the estoppel is precisely the same where the agent of the insurer drafts the papers as it would be in the case of an individual insurer who was himself personally present and acting.— *Rowley v. Empire Ins. Co., 36 N. Y., 550; Anson v. Winnesheik Ins. Co., 23 Iowa, 84; Marshall v. Columbian Fire Ins. Co., 27 N. H., 165; Peoria M. & F. Ins. Co. v. Hall, 12 Mich., 214; Woodbury Savings Bank v. Charter Oak Ins. Co., 31 Conn., 517.*

Another error assigned arises upon the following proceedings.

The plaintiff while upon the stand as a witness, having denied his signature to the application produced by the defendants as the one upon which the policy issued, was cross-examined with a view to test the truthfulness of this denial, and the genuineness of the alleged signature. And in the course of the cross-examination the counsel for the defendants presented to the witness a paper folded so as to

show only the name of the plaintiff in writing, and asked him if the signature there pointed out was his. The counsel for the plaintiff insisted that the witness had a right to look over the whole paper before answering. To this the counsel for the defendants objected, but the court directed that the witness should be allowed, before answering, to examine the whole paper. And having done so, the witness admitted the signature to be his.

Where an expert is undertaking to testify concerning handwriting, it is difficult to set any bounds to an examination which may reasonably tend to test the accuracy of his knowledge, skill, and judgment. Obviously it would be proper to subject him to tests which would be entirely improper and tend unjustly to embarrass and confuse one who did not assume to be an expert, but who might nevertheless have some personal knowledge of a particular specimen of handwriting submitted to his inspection. A person who cannot even read handwriting may nevertheless be able to testify to a particular signature which he has seen made; for particular marks upon the paper may identify beyond question the instrument whose execution he witnessed. But if such a witness were required to look at the signature separated from the instrument, and to say, without any of the aids which the marks upon the instrument would give him, whether that was or was not the signature he saw written, it is perceived at once that the requirement would be unfair, and a categorical answer impossible. Now it may be said that every man is an expert as regards his own handwriting, and may rightfully be subjected to the same tests, when he is called to testify concerning it, that other experts might be tried by; but in fact a large proportion of the people do not possess or assume to possess any such knowledge of the peculiarities of their own handwriting, if any such there are, distinguishing it from any

other, as would justify their expressing the opinion whether isolated signatures, which might be theirs, were in truth so or not. The handwriting of a man who writes but little may never acquire any very definite characteristics, or any great uniformity; and a very accurate penman may possibly copy the correct standard of penmanship so nearly as to render it difficult for him to determine whether a particular word shown him was written by himself or by some other writer, who with equal facility has copied the same standard. All writing in the same language follows in greater or less degree the same models, and some uniformity is always to be expected. If all houses were constructed in a like degree after one plan, it might nevertheless be possible for any house builder to recognize the several houses he had built, if he could see each with its surroundings; but to require him to take a view of one with the surroundings excluded, and to say whether he constructed it or not, could hardly be fair to the witness, or a method likely to bring out the knowledge, if any, which he actually possessed. A man may recognize even a casual acquaintance if his whole person, size, height, carriage and peculiarities of deportment may be observed, when if he were compelled to judge by a single feature, or even by a view of the whole face, he might easily be deceived in consequence of missing something upon which his recognition in part depended. Any examination based upon such partial view might be useful if entrapping the witness were the purpose to be accomplished; but it could not be a reasonable mode of arriving at the truth. The witness in any such case is fairly entitled to all the aids to recognition which the circumstances and surroundings afford; and we think the court very justly and properly required that he should have them in this case. This by no means precludes a careful and critical examination of the witness after the general

question has been answered, with a view to testing the accuracy of the opinion expressed, and the grounds upon which it is based. A thorough sifting of the testimony of the witness is always admissible; but justice to him requires that before he is subjected to that process, he should be allowed to give his testimony in view of all the facts bearing upon the point under examination, so far as they may be within his knowledge, instead of being restricted to a partial and imperfect view, by means of which the likelihood of error, mistake and embarrassment may be greatly increased.

One other alleged error requires notice. In the application presented in evidence by the defendants were the following question and answer:

"*Question*—Incendiarism; have you any reason to believe your property is in danger from it?

"*Answer*—No."

In the blank form produced by the plaintiff, and which he claimed was filled up and signed, the corresponding question is as follows:

"Has a building on the site of this been burned? Have you any reason to believe your property is in danger from incendiaries? Have you ever suffered a loss by fire? If so, how did the fire originate, and in what office were you insured?"

As bearing upon the importance of these questions in the case, the following evidence of the plaintiff is given:

"*Question*—State whether previous to the time of making your application and taking your policy, you said anything to Collyer as to your fears of incendiarism, and if so, when, and what did you say?

"*Answer*—I talked with him very freely. I offered to insure myself against all risks but incendiarism, if he would take it cheaper on that risk alone; I talked with him

about being afraid of incendiaries the fore part of the month, and previously; not one but several conversations; that I was a manufacturer, and was discharging hands, and they would be angry at me; I took precautions and kept a watch several nights.

"*Question*—State whether anything occurred to make any difference in regard to incendiarism, and if so, what?

"*Answer*—I was there several nights. Joe Bennett and I had talked it over about every day, and he was not satisfied that it was an attempt to burn it, or whether it was accidentally from the railroad, and he said, and we both concluded, that there was not any more danger of that than of any other building, if as much; that if any one had attempted to fire it, of which we were not sure, they would'nt be any more likely to come there again than to any other building, and probably not as likely, and I discontinued my watch, and took my books and papers back to the building; I had taken them away some days before. There was no other insurance on the lumber and stock but this, and none on the building but this and the Home Company.

"*Cross-examination*—Directly under one of the windows there was a heap of shavings which had been fired, and had burned up along the side of the building, and had partially burned a pile of felloes; there were two or three lights of glass broken above the fired place, which was on the side of the building nearest the railroad track; the building at one corner was about eleven feet from the track; the fire was inside the building. We came to the conclusion from examination, that the fire was not an accident, and because of that I kept watch. Collyer kept trying to get the risk while I was talking to him about the danger of incendiarism; I told Dr. Knapp the same as I did Collyer, and he took my risk and carried it two or three days till

he had sent it to the company, and they had rejected it·
I never told Collyer about the attempt to burn the build-
ing; we talked over the attempts that had been made in town
to burn two or three other buildings, and the risks of such
fires generally, but I did not tell him of any risk of mine
more than of others in particular; did not tell him of this
attempt at all; I told him about discharging men, and
that manufacturers got men down on them by discharging
them; he knew all about my trouble with Brighams. I
suspected a man of firing it when I discovered the attempt,
and when the building was burned I suspected the same
man; I did not tell Collyer of this, but he knew I was
having trouble with Topliff; I told Eldredge about my
fears, and he advised me to get insured; I met him as I
came out of Collyer's office; he was my counsel at that
time. I told him there was one question I looked at twice;
it was "Have you any fears, or have you any reason to
fear an incendiary fire;" and he asked me if I had, and I
replied that I had not now, and he said that it was legal,
or all right; there was such a question as that; that
question was in the application I did sign, and I answered
it "No" when I made out the application."

Upon this evidence the court was requested by the
defendants to charge the jury as follows:

"1. If the jury believe from the evidence that at the
time of procuring the policy sued upon, the plaintiff knew
that an attempt had been recently made to burn the prem-
ises insured, and failed to disclose that fact to the defend-
ant's agent who issued the policy, the defendant is entitled
to recover.

"2. If the jury believe from the evidence that a written
application was made by the plaintiff to the defendant, upon
which the policy sued on was issued, in which applica-
tion the plaintiff stated that he had no reason to fear that

his property was in danger from incendiarism, and they find, as matter of fact, that he had such reason, then their verdict must be for the defendant."

These requests were refused, and the court charged as follows instead:

"If the jury believe from the evidence that at the time of making the application the plaintiff had ceased to fear from incendiaries the burning of his property, and did not think he had any reason to believe that his property was in danger from it, then the fact that it was once fired will not vitiate the policy, and was' not a breach of warranty expressed by the answer to the question on this subject, if there was such warranty.

"If the jury believe from the evidence that an attempt had been made to burn the building covered by the policy of insurance sued upon, shortly prior to the application made by the plaintiff for such policy of insurance, and that said plaintiff then knew of said attempt, and did not disclose it to the agent who issued the policy; if the jury believe that a knowledge of such attempt was material to the risk, their verdict must be for the defendant, if the agent of the defendant had not sufficient knowledge to put him upon inquiry as to said prior attempt to burn said building."

Now we think that the court in the refusals to charge, and in the charge given, committed two errors which may have affected the verdict of the jury very materially to the prejudice of the defendants: *first*, in assuming that an attempt to fire the building insured might be a circumstance not material to the risk; and *second*, in treating the information which was sufficient to put the agent upon inquiry as sufficient to justify the plaintiff in his failure to communicate the facts within his knowledge, notwithstanding his attention was particularly called to the subject at the time the application was prepared and signed.

THE NORTH AMERICAN FIRE INSURANCE CO. v. THROOP.

Whichever application the plaintiff signed, his attention was directed by proper interrogatories to the subject of incendiarism. And it cannot be denied that an attempt to destroy by fire the property upon which insurance is sought, is usually regarded as a circumstance of very high importance, and as one that presumptively is always material to the risk, though possibly in any particular case the insurer, if he were cognizant of all the facts, might know that the particular attempt that had been made was not likely to be repeated. Without explanation the inference must usually be, that an effort to fire the building of another indicates an evil motive which is likely to induce other attempts until the destruction is accomplished; and no prudent insurer would treat the attempt as immaterial, unless he had satisfied himself by careful inquiry, either that the motive for making it no longer existed, or that a renewal of the attempt had for some other reason become impracticable or unlikely. No one can question its being both proper and prudent for the insurer in his application for policies to treat this circumstance as material, and to require specific and truthful answers concerning it; and when he has done so, and made their truthfulness a condition of the contract, we do not think it competent to submit to a jury the question of materiality, and allow them to find, in opposition to the contract of the parties and to general experience, that it was unimportant. We think a fact thus specifically inquired about, and generally of such vital importance, is to be considered material as matter of law, and defendants were entitled to a charge accordingly.

But it is argued that the agent had full information of the plaintiff's fears of incendiarism, and being thus warned, he was sufficiently put upon inquiry concerning the attempt to burn the building if one was made. This doctrine, as applied to the facts of this case, strikes us as very danger-

ous. It is not pretended that the plaintiff ever informed the agent of the facts which led him at one time to think an attempt at incendiarism had been made; and indeed the contrary is sworn to by him. The plaintiff's general talk about a fear of the building being burned was precisely of that character to be well calculated to lead the agent away from any supposition that this particular building had been or was likely to be singled out from among others in the same city for destruction; and his answer to the interrogatory in the application, if not untruthful, was at least wanting in candor and frankness, and had a tendency to mislead. When a person is particularly interrogated regarding a subject peculiarly within his own knowledge, and the other party is expected to contract with him in reliance upon his answer, and the answer is made misleading if not untruthful, it seems to us a perversion alike of law and justice to say that he shall have the advantage of his uncandid answers if he can convince a jury that the other party was wanting in prudence in relying upon them, because of having notice extrinsic these answers, which was sufficient, if followed up by inquiries in other quarters, to have led him to a knowledge of the exact facts. The insurer has a right to know the truth from the assured himself; and if the inquiries addressed to him fail to elicit the truth, it is no excuse for the latter, either in morals or in law, that the insurer, if sufficiently distrustful and suspicious, and inclined to rely upon what he had heard from other sources rather than upon the word of the assured himself, could be regarded as "put upon inquiry" respecting the truthfulness and candor of the information given him, in consequence of something that he had heard incidentally, at a time when perhaps he had no special occasion to charge his memory with it. He goes to the authority that ought to be the best, and he has a right to rely upon

what is told him; if it were allowable to submit to a jury the question of his prudence in doing so, it would be impossible for that tribunal, in most cases, to be so fully possessed of the exact condition of his information at the time as to be enabled to determine whether he was or was not guilty of negligence in such reliance.

The danger of such a rule as was laid down by the circuit judge appears well illustrated in this case. It was submitted to the jury to say whether the agent had not sufficient knowledge to put him upon inquiry as. to a prior attempt to burn the building; and if they reached that point at all in the course of their investigations, they must have found that he had. But we look in vain through this record for anything upon which such finding could justifiably be based. The expression to Collyer of the plaintiff's fears was not at all calculated to impress him that any attempt had as yet actually been made; and no information is shown to have come to the agent from any other quarter which could justly charge him with want of prudence in not pursuing inquiries in other directions. The effect of the charge was to permit the jury, in construing and applying the contract, to substitute their own views of what was material, and of what was prudent for the insurer, for the views of the parties embodied in the writings, which we have already seen were eminently reasonable, and which they had agreed upon as the evidence of what the contract was to be.

These views render it necessary that there should be a new trial. We have not examined in detail all the errors assigned, because the views expressed render some of them unimportant, and we think what is here said covers the whole ground sufficiently for the purposes of a new trial. We think the court erred in charging the jury as requested by the plaintiff, that "if the jury believe from the evidence

that the application produced by the defendant is not the genuine application signed by the plaintiff, and upon which the policy issued, then there is no proof in the case upon which the jury are authorized to find what the contents of that application were, or that there was any warranty in it to affect the plaintiff's right of recovery." The evidence of the plaintiff sufficiently shows that he was inquired of concerning attempts at incendiarism, and that he gave a negative answer. It also shows that he warranted the correctness of his answers so far as pertained to the risk. Whether if no such inquiry had been made by the application, and the plaintiff had failed to make 'a full disclosure, the policy would have been void for that reason, is a question which does not arise upon this record.

The judgment must be reversed, with costs, and a new trial ordered.

The other Justices concurred.