# OCTOBER TERM, 1921.*

NORTHERN ASSURANCE CO. OF MICHIGAN *v.* KELLY.

1. INSURANCE—LIFE INSURANCE—SOLICITOR AGENT OF INSURER—STATUTES.

Under section 9305, 2 Comp. Laws 1915, the person soliciting an application for insurance upon the life of another must, in any controversy between the assured or his beneficiary and the company, be regarded as the agent of the company and not of the assured.

2. SAME—STATEMENTS IN APPLICATION—NOTICE OF OPERATION TO SOLICITOR BINDING ON INSURER.

In a suit by the insurer to cancel a life insurance policy, after the death of assured, on the ground that untrue statements were made in the answers to material questions contained in the application, *held*, that if the applicant truthfully stated the facts as to previous operation and illness to insurer's agents their failure to record same in the application would not invalidate the policy, especially where it is not shown to have in any way contributed to the disease which caused his death.

3. SAME—FINDING OF COURT—EVIDENCE—SUFFICIENCY.

The finding of the court below that assured informed insurer's agents of a previous operation and illness, *held*, justified by the record.

Appeal from Allegan; Cross (Orien S.), J. Submitted October 20, 1921. (Docket No. 147.) Decided December 21, 1921.

Bill by the Northern Assurance Company of Michigan against Mabel A. Kelly and another for the cancellation of a policy of insurance. Defendants filed

*Continued from Vol. 216.

a cross-bill to enforce the policy.   From a decree for defendants, plaintiff appeals.   Affirmed.

*Fred H. Aldrich* and *George E. Leonard,* for plaintiff.

*Marvin J. 'Schaberg,* for defendants.

'MOORE, J.   This is a bill filed for the purpose of securing the cancellation of a policy of insurance upon the life of George W. Kelly, deceased, upon the ground that untrue statements were made in the answers to material questions contained in his application for insurance.   The defendants filed an answer in the nature of a cross-bill in which it was averred that true statements were made to the agents of the plaintiff when the application was made, and asking for affirmative relief.   From a decree in favor of the defendants, the case is brought here by appeal.

It is the claim of the plaintiff that the insurance policy is void for the reason that George W. Kelly made false and fraudulent answers to certain questions in the application, in that he failed to state that he had a serious operation in 1902, and that he had stomach trouble in 1912.

It is the claim of the defendants that, even though the answers were not correct in the application, the facts were communicated to the agents of the plaintiff, and that the policy is therefore valid and should be paid in full.   It is admitted that George W. Kelly had a serious operation in 1902, and that he had stomach trouble in 1912 when he vomited up a Murphy button used in the operation in 1902.

In March, 1919, T. R. French, who described himself in the application, general agent, accompanied by L. Prager, visited the home of Mr. Kelly for the purpose of selling him life insurance in the plaintiff company.

Upon the trial Mr. Prager, who was a witness for the plaintiff, described himself:

"*Q.* And what was your business with the Northern Assurance Company at the time this insurance application was written?

"*A.* I was agency supervisor.

"*Q.* Agency supervisor.   What were your duties?

"*A.* My duties were to keep the agents happy by working with them and closing business for them; those were my general duties, calling up them from time to time.

"*Q.* You had charge, then, of all the different agents in this company?

"*A.* I wouldn't go so far as to say that, no.   There were some that didn't come under our supervision at all.

"*Q.* How many?

"*A.* Not a great many; I don't know exactly.   *   *   *

"*Q.* Tell us, generally speaking, who you had supervision over?

"*A.* Generally speaking, the agents that required attention, closing business for them.

"*Q.* How many?

"*A.* Quite a few.

"*Q.* How many?

"*A.* I will say approximately 12 or 15.   *   *   *

"*A.* I close both difficult cases and others also. When I went and called upon a man it was generally understood he took me to everything we had interviewed, both easy marks, so-called, and hard ones. I am not an expert, so to speak, so I have to have an easy one once in a while to kind of make the law of average."

After Mr. Prager and Mr. French had urged Mr. Kelly for nearly an hour to take insurance, Mr. Prager doing most of the talking for the company, Mr. Kelly consented to make an application, and one was written out by Mr. Prager and signed by Mr. Kelly.   Mr. Prager and Mr. French testified that the answers to the questions were written in the application just as Mr. Kelly made them.

Mrs. Kelly and two neighbor women were where they heard most of the conversation between Mr. French, Mr. Prager and Mr. Kelly. Mrs. Kelly testified in part as follows:

"*Q.* When did you first see Mr. French, the agent of the Northern Assurance Company who testified in the case?

"*A.* They called to our place about 6:30 on the evening of March 25th, and at that time Mr. Kelly was in Holland. * * * Mr. French asked me if I was Mrs. Kelly and I said I was and he said 'We are from the Northern Assurance Company,' and I said, 'Mr. Kelly was not in but he will be back on the 7 o'clock car.' * * * They came back very shortly after Mr. Kelly returned; he was in the kitchen having lunch at that time.

"*Q.* Just tell the court if you will what transpired and what conversation you heard between your husband, George Kelly, and either or both of these insurance agents.

"*A.* By that time he came into the dining room. * * *

"*Q.* What did Mr. French say?

"*A.* He said, 'Well'—I think he called him George; * * * he said 'How about this?' George said, 'I don't believe I can take it out, I am under heavy expenses right now,' and furthermore he had had an operation.

"*Q.* And did he say what the operation was for?

"*A.* He went on and discussed the operation as he always did when he would speak of it; he would always go into details.

"*Q.* Did he say anything at all about the effects of the operation?

"*A.* Nothing more than that the Murphy button didn't pass—* * *

"*A.* He went on and said he had had this operation and Mr. Prager asked him how long ago that operation was and he said 17 years. They went on to state—

"*Q.* 'They,' which one was that?

"*A.* Mr. Prager done the talking and he said any-

thing after 10 years was the same as no operation at all, the company accepted the risk after 10 years.

"Q. How long did this conversation last, how long were they talking?

"A. They were there maybe an hour to an hour and a quarter, maybe an hour and a half.

"Q. State how long they were discussing this operation if you remember?

"A. Oh, a good half hou

"Q. State, if you will, what George said to them, if anything, with reference to the Murphy button not passing and being coughed up?

"A. He went on and told them about he had had a sickness; he told them of the sickness in 1912."

On the cross-examination she testified in part:

"Q. That is all so far as that is concerned.   Now who first brought up the question of any operation?

"A. Mr. Kelly did.

"Q. What did he say, give me his words?

"A. He said that he had had an operation.

"Q. Just say it the same as if you are talking.   'I have had an operation,' is that what he said?

"A. He said 'I have had an operation,' and they said, 'How long ago was it?' and he told them 17 years ago.   *   *   *   He said that the operation was on the stomach and that he had made a full recovery of it and the operation itself was a perfect success, but he was leading the insurance company on, or the agents, not to force him to take this insurance because he didn't feel he was able to take it, and they were leading him on he was a fit subject to take it.

"Q. State anything else he said about his health at any time before this examination?

"A. He went on and told them he had had a sickness in 1912 from the operation.

"Q. How is that?

"A. He went on and told them he had had a sickness from the operation in 1912.

"Q. What did he say about the sickness in 1912?

"A. Hemorrhage.

"Q. I know, but I want to know what he said about it.

"A. He went on to tell that the Murphy button was

used, and he always discussed this Murphy button as a—well he felt proud of it; if he told anything he went into the full details.

"Q. Now, as a matter of fact, wasn't you drawing conclusions as to what he said from the fact he always did talk that way?

"A. No sir; I was standing right there.   *   *   * He went on and told them he had had this operation of the stomach; it was caused by a bone of a pork chop as I remember.

"Q. Did your husband say anything to Mr. French or Mr. Prager about the pork chop?

"A. I don't know as he did about pork chop but he told of the ulcer and making the new connection in his stomach with the Murphy button, and they went on to question him—

"Q. What did they say to him about it?

"A. They asked him how long ago it was and he told them it was in 1902 he had had this operation.

"Q. He told them he had fully recovered from it?

"A. Yes, sir.

"Q. Anything else said about it?

"A. Nothing more than he had had a slight attack of hemorrhage caused from the Murphy button being removed.

"Q. He told them he had had a slight attack of hemorrhage?

"A. Yes, sir.

"Q. That was in 1912?

"A. Yes, sir."

The two neighbor women confirmed in substance the testimony of Mrs. Kelly.

After the testimony was taken on the part of the defendant Mr. Prager was recalled.   We quote:

"Q. You have heard the testimony of Mrs. Kelly about what took place, you have heard the testimony of Mrs. Greenhalgh, you have heard the testimony of Mrs. Wilson and you have heard the testimony of Doctor House in which he directly contradicts your testimony, and you say that the testimony of all those four is untrue and what they said didn't take place?

"A. I brand them as absolutely false in that."

It is the claim of the appellant that a decree should have been entered canceling the policy. We quote from appellant's brief:

"It is the claim of the above named plaintiff that the insurance company issued its policy of insurance believing and relying upon the statements made in the application of the assured, that they were false and fraudulent, and that it was deceived thereby and that the same rendered the policy void at the election of the said company. There is no question but that said representations were false and they were material, as testified to by every physician who was called as a witness in the said cause.

"While the agents denied that any statements were made in their presence apprising them of the true state of the facts in reference to these matters, it is claimed upon the part of the company that even if such statements had been made to these agents, the assured would not have been excused for making the false representations in his application, that these statements were made to aid the officers of the company in determining the question as to the insurability of the applicant, and that they would have a right to rely upon them and would not be bound by oral statements made to the agents of the company; that they employed an examining physician who gave his opinion as to the insurability of the risk; that his opinion was based upon the examination, the questions and answers contained in the application." Counsel citing authorities which they claim sustain their contention.

The question is not a new one in this State. Some of the cases in which a like question was considered will be mentioned later.

Section 9305, 2 Comp. Laws 1915, provides:

"Any person who shall solicit an application for insurance upon the life of another shall, in any controversy between the assured or his beneficiary and the company issuing any policy upon such application, be regarded as the agent of the company and not of the insured."

In the early case of *Temmink* v. *Insurance Co.*, 72 Mich. 388, in an opinion written by Justice CAMPBELL, it was held that, where the agent put down answers that the appellant never made, the insurance company was liable.

In *Haapa* v. *Insurance Co.*, 150 Mich. at p. 471, (16 L. R. A. [N. S.] 1165), Justice OSTRANDER, speaking for the court, quotes with approval as follows:

"The rule of *North American Fire-Ins. Co.* v. *Throop*, 22 Mich. 146, is that,—

" 'If there has been no fraud¡ and no concealment, but a full and frank statement of all the facts, and the insurer has framed the papers to suit himself, in view of all the circumstances, the law would justly be subject to the reproach of favoring deception and fraud, if the insurer was allowed to retain the premium, and at the same time repudiate the contract, for his own failure to make its recitals correspond exactly with the facts.'

"In that case it appeared that,—

" 'The plaintiff claims that he gave the agent full information on the subject [of incumbrances], and insists that if there was any failure to mention it in the application, it was for reasons operating exclusively upon the mind of the agent, and not affecting his own action. We think evidence of these facts was competent. Its purpose was, not to vary or contradict the contract of the parties, but to preclude the party who had framed it from relying upon incorrect recitals to defeat it, when he himself had drafted those recitals, and was morally responsible for their truthfulness.'

"It is pointed out in the opinion that,—

" 'Where the particular fact called for by an interrogatory is unimportant, or nearly so, under the circumstances of the particular case, it is very easy for the assured to be led to suppose that such interrogatory, which he knows was prepared generally and for the purpose of meeting the cases in which it would be of practical importance, was not to be relied upon in his own case, and if the insurer himself, or his agent, drafts an answer to such interrogatory, in which he treats it as immaterial and does not observe strict accuracy in his statement of

facts, the assured might well suppose he would be thought captious and hypercritical if he should insist upon answers exactly correct; when the party seeking the information, and who alone was interested in it, was satisfied with statements less accurate, and which with full knowledge of the facts, he had written out to suit himself.' "

Justice OSTRANDER made a review of the cases which had been decided by this court up to that time and said:

"The decisions of this court are not conflicting and must be read and considered together for the purpose of discovering and following the rule of law applicable to the question under consideration."

In *Kane* v. *Insurance Co.*, 204 Mich. 357, it was held, we quote from the syllabus:

"If the insurance company, through its officers, had actual knowledge of the fact that assured had been rejected by another company, a false statement in the application that he had never been rejected would become immaterial."

It was held the question was one for the jury. After that opinion was filed the case was again tried and a verdict and judgment was rendered in favor of the plaintiff. The case was brought here by writ of error. It is found in 214 Mich. 329. The judgment of the court below was affirmed.

There is nothing to indicate in the instant case that Mr. Kelly had any desire to mislead or defraud the insurance company. He did not seek the agents but they sought him, and it required a good deal of urging by them before he would make application for the insurance. The chancellor found, and we think he was justified in finding, that Mr. Kelly told the representatives of the company about the surgical operation in 1902, and about his vomiting up in 1912 the Murphy button.

The attending physician who was called as a wit-

ness by the plaintiff, after describing the illness of Mr. Kelly in 1912, said:

"*Q.* What was his condition when you last treated him in August of that year?

"*A.* August, 1912?

"*Q.* Yes.

"*A.* I considered he was in pretty good condition when I dismissed myself.

"*Q.* Was he still suffering from loss of blood?

"*A.* He was somewhat anemic at that time but his stomach was in pretty good condition. I was feeling good about his case because I thought at that time perhaps the cause of the hemorrhages had been removed by vomiting the button."

This doctor continued to know Mr. Kelly.

"*Q.* And you knew something of his life and habits, that is that he was a man that worked and did ordinary manual labor?

"*A.* When I knew him at first I think he was a chauffeur. I knew him as a man who did all kinds of labor, mental and physical; I think he did some bookkeeping."

Mr. Kelly died from acute lobar pneumonia. There is nothing in the record to indicate that the surgical operation of 1902, or the illness of 1912, contributed in any degree to the cause of his death.

The decree is affirmed, with costs to the defendants.

STEERE, C. J., and WIEST, STONE, CLARK, BIRD, and SHARPE, JJ., concurred. FELLOWS, J., did not sit.