**AMERICAN LIFE INS. CO. v. BUNTYN.**

I Div. 772.

Supreme Court of Alabama.

May 25, 1933.

B. F. McMillan, Jr., of Mobile, for appellant.

Robert H. Smith, of Mobile, for appellee.

BROWN, Justice.

The original bill was filed by appellant to effect a rescission and cancellation of a policy of insurance issued to Daniel Andrew Buntyn on the 1st day of October, 1931, insuring the life of said Buntyn, and naming the respondent, Genevieve Pradoso Buntyn, the insured's wife, as the beneficiary.

The ground on which the bill seeks to rescind the contract and cancel it is that the insured in his written application for the issuance of the policy falsely represented that he had never had a surgical operation, except for hernia, and that said operation was without "after effects," while in fact insured knew that he had an operation in which one of his testicles was removed, and falsely represented that he had never had "a disease of the genito-urinary organs," and had never had a cancer or tumor of any kind; that in fact he died, within three months from the receipt of the policy, from a malignant tumor or cancer.

The bill alleged a previous tender to the respondent of the premiums, and offered in the bill to pay said premiums upon cancellation of said policy.

The respondent answered, denying the allegations of the bill charging fraud, alleging that insured stated to the defendant's agent, while said agent was taking and preparing said application, that he consulted Dr. Henderson, who advised an operation, and that said surgeon operated and removed his right testicle; that said agent wrote insured's answers, and stated to insured that the answers written in said application were the proper answers to said questions. The respondent made her answer a cross-bill, praying for a decree against the complainant for the sum stipulated to be paid with interest.

On final submission on pleadings and proof, the court denied complainant relief, and

granted the respondent relief as prayed in the cross-bill.

The policy contained the following clause: "This policy * * * shall be incontestable after one year from date of issue, if the insured is then living, except for non-payment of premiums," etc.

The equity of the original bill is rested on the theory that it was incumbent on the insurer to institute some legal proceedings contesting the validity of the policy, though it had matured by the death of the insured, and no suit had been instituted or was pending when the bill was filed. The following cases are cited to sustain this theory: Jefferson Standard Life Ins. Co. v. McIntyre (C. C. A.) 294 F. 886; Powell v. Mutual Life Insurance Co. of N. Y., 313 Ill. 161, 144 N. E. 825, 36 A. L. R. page 1239; National Life & Accident Ins. Co. v. Nagel, 260 Mich. 635, 245 N. W. 540; Priest v. Kansas City Life Insurance Co., 119 Kan. 23, 237 P. 938, 41 A. L. R. page 1100; Louisiana State Life Ins. Co. v. Phillips, 223 Ala. 5, 135 So. 841, and others. See contra, Pacific Mut. Life Ins. Co. of California v. Strange, 226 Ala. 98, 145 So. 425.

However, the equity of the bill was in no way contested before the trial court, and is not questioned here. Therefore we confine ourselves to a consideration of the questions presented by the parties, and pretermit any decision on this question.

The evidence is without dispute that the policy was issued on the faith of the information contained in the written application therefor, without medical examination, and the evidence tends to show that, if officers and agents of the insurer who were charged with the duty of passing on applications and issuing policies of this character had been informed of the true state of Buntyn's health, the policy would not have been issued—certainly, without further investigation.

The evidence is further without dispute that insured was operated on by Dr. Henderson in April, 1931. Dr. Henderson testified as to this operation: "He came to us about a year before his death, or it may have been longer. I have it on my records but don't remember the exact date. He complained of a swollen testicle, which he stated had occurred following an injury. We treated him and the acute swelling subsided somewhat, but the testicle never returned to normal. He continued complaining of it causing him pain, and it stayed larger than it should have been and became hard. We saw him every week or so from then until the time he was operated on. The time he was operated on the first time was—you have that date which I gave you. It was in April of 1931 when we advised him to have that testicle removed, as it was useless from a functional standpoint and might possibly cause trouble later if not removed, and that was done. * * * He said that he felt all right and as far as we could

see he was in good health. He came to the office, I suppose for about a month or six weeks after the operation when we discharged him and he was evidently well then."

Immediately following, this witness testified as to the circumstances and cause of Buntyn's death:

"Then I never saw him again until around about two or three weeks before he died. The date of his death was in January of 1932. He came to our office about three weeks before his death. He was sent around there by Dr. Townsend, who had sent him to us. He had been complaining of kidney trouble. The history that he gave at that time was that for two or three months before this he had been complaining of pain in his back and the upper part of his abdomen on the left side. Dr. Hale treated him. He didn't improve and then he went to Dr. Townsend, who examined him and he thought that he could feel a mass in the upper part of his abdomen on the left side. He knew that we had done the other operation, and, while he didn't know if there was any connection between the two, he sent him to us to examine him, and he said that the cause of his trouble was not kidney disease. I examined him and was not sure that I could feel the mass. He was complaining of quite severe pain, and the pain was so great that I told him he should be in bed. I sent him to the City Hospital and watched him there for a day or two, and then decided to perform what we call an exploratory laparotomy, to open up the abdomen and see if there was a mass there or what was there. We did that, and I think he lived about six or seven days after the operation before his death. We found a very rapidly growing tumor in the left upper portion of the abdomen. This tumor seemed to start over in the lower right quadron of the abdomen and had grown in that direction. We simply saw it was useless to try to remove it, so we closed him up and came out, and he died in five or six days. That tumor was malignant. We thought at the time from the gross appearance of the tumor that it was malignant; it was too extensive to try to remove. I think the pathological report of his death showed that it was malignant. Laymen speak of a malignant tumor as a cancer and we do too and this was cancer, and he died from the effects of that. Of course the vital statistics bureau requires that in a case operated on the report shows that they usually die of the operation. He would have died of this tumor regardless. He may have lived a week or two weeks or a month longer. You cannot tell about that. The tumor that we found could have been traceable to the affected testicle. We endeavored to find the pathological report of the testicle that was removed but due to some error or to the fact that they were not making those examinations at the City Hospital at the time the first operation was done, they never made a pathological report. We could not

know whether that testicle had any malignant change or whether it was simple infection or just a trauma that caused it. At the time the symptoms of the pain were such that it felt more like a tubercular thing than anything else, not knowing the original cause of that swollen testicle, other than trauma, other than injury, we cannot say whether the tumor in the abdomen was caused from the testicle or not. As a rule, when a cancer of the testicle is advanced far enough to cause symptoms to bring the attention of the patient or the physician to it, it has progressed too far to remove. In other words, even if the testicle had been removed earlier, if it had been malignant, it would have gone ahead. I don't know and have never been able to make up my mind as to whether the trouble in the abdomen was the same trouble that caused the trouble in the testicle. At the time the operation was done I was not there. I was of the opinion that it was infectious and not malignant. If it had been malignant, I would have advised him to have X-ray treatments.

"To my definite knowledge I would say the tumor or cancer that was removed in 1932 had existed from the time he started going to Dr. Hale for treatment for kidney disease, complaining of pain in the back and side. Of course if it had all come from the testicle it must have existed at least from the time the testicle had been removed. I have never formed an opinion as to whether the seat of the trouble continued from the time the testicle was removed. It is my opinion that the tumor was probably malignant in September of 1931. In other words, when he started complaining of pain it was probably the first sign of the tumor. We don't know the cause of cancer. There are several theories about it. One is that it is due to chronic irritation, infection, which could be produced by infection or continual bruising or hurting or any injury to tissues makes it more liable to infection. If it was due to the injury it had existed since the first of 1931. The injury could have caused the development of the tumor. It would be considered as a disease of the genito-urinary system. That was no hernia operation. A hernia operation would not be serious and the seriousness of a tumor operation would depend on the site of the tumor and any operation in which the abdomen is opened is a serious operation. The mortality rate in the case of tumor or cancer is very much greater than for hernia, and the likelihood of early death is much more probable. The risk of loss for tumor is greater than for hernia."

On cross-examination:

"Laymen of an ignorant class, especially about matters of this kind, probably would not know what you meant when you speak of the genito-urinary system. It is the general understanding that when you speak of genito-urinary diseases, gonorrhea or syphilis is meant. If you would ask a patient whether he had a disease of the genito-urinary system I would think that he would imply that you were asking whether he had any venereal disease, gonorrhea or syphilis. A bruise or an injury to the testicle, technically speaking, would be spoken of as an injury, but any condition interfering with normal function of tissue, the tissue is diseased. Ordinarily a doctor would distinguish between disease and injury and would call that injury and not a disease. That is the way it is generally spoken of by doctors and laymen. I don't remember the exact date the patient complained of the pain but my recollection is that it seems to me that he told me he had gone to Dr. Hale two or three months before we saw him in December or January. I do not recall exactly how far back it went and when I stated in substance that he had probably had this trouble on September 1st, 1931, I meant that he probably had it from the time he went to Dr. Hale. I think I filled out one of the forms on which I gave the date when he told me he had gone to Dr. Hale. I do not know whether he had this trouble as early as September 1st, 1931, but do know that he had it from the time he went to Dr. Hale. I have no knowledge of when the trouble started, but would judge that he had it from the time he began to complain of pain in his side. One reason I never could form an opinion as to whether the injury in the right testicle or the tumor in the right testicle, or whatever it was, was also the cause of the trouble in the abdomen was the tumor seemed to be more on the left side, while the testicle that was removed was on the right side. Some of the tumor was on the right, but most of it was on the left. I could only find a little bit on the right side and it did not run down into the region of the right testicle. I filled the City Hospital operative chart out at the time. It was hard for me to remember exactly what we found. I remember that we made our incision on the left side of the abdomen and some of the tumor was on the right side. I would have thought that if it came from the right testicle that more of the tumor would have been on the right side. There is no way of telling that absolutely."

And on re-direct examination:

"When he came to see me and I discovered this tumor, he told me that within a few days or a week from the time that he began to have trouble he went to see Dr. Hale. This injury, resulting in the removal of his testicle, interfered with the ordinary functions of the tissues and would probably interfere from the time of the injury up to the time the testicle was removed. He knew what had been done and I don't know whether he knew that the testicle was going to be removed before it was removed, but he knew what had been done when it was removed."

Dr. Lull testified, in response to a hypothetical question based solely on Dr. Henderson's testimony, that "in all probability the tumor or cancer or the small implant from which it grew was present. My judgment and experience as a physician and surgeon would lead me to believe and I so state as my professional opinion, that the tumor or cancer was traceable or probably traceable to the same cause that resulted in the operation where the testicle was removed in the preceding April."

The complainant also offered "Medical Certificate of Death" signed by Dr. Henderson, stating: "The principal cause of death and related causes of importance in order of onset were as follows: (Operation for) Recurrent Tumor of Abdomen (following removal of mixed tumor of testicle) 1 yr ago. Date of onset contributory causes of importance not related to principal cause. Name of operation Laparotomy Date of 1/7/32."

The respondent offered the evidence of two witnesses going to show that Buntyn was a member of the Mobile fire department; that the insurance agent, who was not then known by any of the parties, appeared at the fire station and solicited those present to take insurance; that Buntyn agreed to make an application; that the agent questioned him, made notes, and went away, and some time thereafter returned with the application prepared in typewriting, and it was signed by Buntyn in the presence of the witnesses without reading it, with the addition made by the agent to the answer to question 9 of part II, "No after effects"; that Buntyn stated to the agent the fact of the operation performed in April by Dr. Henderson and its nature and the result. This evidence was not contradicted, except by the statements made in the written application. There was no affirmative evidence showing or tending to show collusion between the agent and Buntyn.

The appellant's contention is that the insured made false answers to the following questions in part II of the application, to wit:

"8. When did you last consult a physician and for what? April, 1931
Name of physician Dr. Henderson
Address of physician St. Francis St.
Illness Hernia operation
Duration of Illness 5 weeks."

"13. Have you any deformity, amputation, or any physical disability? No
If so, give details. No."

"16–h. Have you ever had syphilis, or gonorrhea, or any other disease of the genito-urinary system? No.

"i. Have you ever had a cancer, or tumors, or ulcers of any kind? No."

■ If, as the weight of the evidence shows, Buntyn disclosed to defendant's agent the fact of the first operation and its result, in the absence of evidence showing collusion between the insured and the agent, the law imputes to the defendant notice of facts coming to the knowledge of the agent acting within the line and scope of his authority in the prosecution of the principal's business. American Cent. Life Ins. Co. v. First Nat. Bank of Enterprise, 206 Ala. 535, 90 So. 294.

In the case just cited, the question decided was presented by demurrer to the plaintiff's replication to defendant's plea. The plea averred that the "insured, in his application for the policy, had falsely, *and with actual intent to deceive*," made the representations. (Italics supplied.) This averment was confessed by the replication, and, construing the averment most strongly against the pleader, it showed collusion between the agent who took the application and to whom the true facts were disclosed and the insured.

■ The evidence here does not show that Buntyn had any knowledge that the agent had not written into the application the information which Buntyn disclosed to him, and, in the absence of such knowledge, he had the right to assume that the agent had acted honestly with his principal. The evidence fails to show that Buntyn was guilty of fraud or deceit in respect to question 8.

■ In the light of the testimony of the medical witnesses, we are clear to the conclusion that questions 13 and 16–h did not suggest to the lay mind an operation and the result, such as was performed on the insured in April, 1931. The result of that operation was neither "a deformity" nor "an amputation," nor was it necessarily "a physical disability," and question 16–h, as Dr. Henderson testified, would suggest to the lay mind only such diseases as gonorrhea, syphilis, etc., and there is no satisfactory evidence that the insured had ever been afflicted with such disease.

■■ As to question 16–i, the evidence is clear to the conclusion that the insured had no knowledge that he had cancer or tumor or ulcer of any kind. The operation in April, 1931, was performed with the idea that in-

sured's condition was the result of an injury. The surgeon, Dr. Henderson, did not discover the true nature of insured's affliction until he performed the "exploratory laparotomy," and the evidence falls far short of showing that the removal of the insured's right testicle had any connection with the malignant tumor that caused his death. Therefore it cannot be affirmed that the answer in respect to the first operation related to a matter that increased the risk of loss. Louisiana State Life Ins. Co. v. Phillips, 223 Ala. 5, 135 So. 841.

Moreover, it is a matter of serious doubt whether the photostatic copy of the application embraced in the policy, so reduced in size as that its contents cannot be deciphered without the use of a magnifying glass, is a compliance with the statute which requires that the provisions of policies of insurance must be "plainly expressed." Code 1923, § 8371; Manhattan Life Insurance Co. v. Verneuille, 156 Ala. 592, 47 So. 72; Fidelity Mut. Ins. Co. v. Preuser, 195 Ky. 271, 242 S. W. 608; 32 C. J. p. 1121, § 220. The exigencies of this case do not require a decision of this question, though it is urged in argument by appellee.

We find no errors in the record, and the decree will be affirmed. It is so ordered.

Affirmed.

ANDERSON, C. J., and THOMAS and KNIGHT, JJ., concur.