102 P.2d 31

GRIEGO v. NEW YORK LIFE INS. CO

No. 4465.

Supreme Court of New Mexico.

April 16, 1940.

Wilson & Watson, of Santa Fe, for appellant.

Fred C. Stringfellow, of Raton, for appellee.

MABRY, Justice.

Plaintiff filed her complaint alleging that she was the beneficiary named in an insurance policy issued by defendant on November 9th, 1937, on the life of plaintiff's husband; that the insured died February 25th, 1938; that due proofs of death had been furnished; and that the defendant had refused payment.

Defendant filed an answer and cross-complaint, in which it admitted all allegations of the complaint except the liability claimed. In addition an affirmative defense was interposed to the effect that the insured had obtained the policy by means of a written application by him signed, wherein, answering interrogatories submitted, he made certain materially false and fraudulent representations regarding his health and medical history. It was further alleged that a true copy of the application was attached to the policy when issued and that the policy, with attached copy of application, was delivered to the insured on November 16th, 1937, and accepted and retained by him up to the date of his death without objection or notice to the defendant that any representation or answer in the application was incorrect or false.

By reply and answer to the answer and cross-complaint plaintiff admitted that the insured had made and signed the application, admitted that the false answers specified in the answer and cross-complaint were incorporated in the application the insured signed, and admitted them to be false. But she alleged that defendant's soliciting agent, Fairchild, wrote the application; that the insured signed it without reading it; that the insured fully disclosed the truth as regards his health and medical history in answer to the questions; and that the agent wrote down the false answers without the knowledge of the insured. She admitted the delivery of the policy with true copy of application attached, and the retention of it without objection or notice of the falsity of the answers; but alleged that the insured immediately put the policy away without reading it. She further charged the defendant, as a matter of law, with

knowledge of the falsity of the answers through the knowledge of its agent.

To this reply and answer defendant demurred, raising the points: (1) that it was the duty of the insured to read the application before signing it, and that his failure to read it was not enough to permit him to escape the consequence of its falsity; and (2) that it was the duty of the insured to read the contract (policy and attached copy of application) thereafter delivered to him, and that by retaining it without objection, whether he read it or not, he adopted the false answers as his own. The demurrer was overruled.

Defendant then replied denying each allegation of new matter contained in plaintiff's answer to the cross-complaint. The cause was heard upon the merits on the foregoing pleadings, the issues were found for the plaintiff and defendant company appeals.

Due proofs of death were furnished, defendant refused to pay the loss, and tendered return of all premiums paid upon its election to rescind the contract because of alleged false representation in the application.

. The application signed by the insured, a copy of which was attached to the policy when issued and delivered, contained the following representations in response to questions found in the application form:

"Have you within the last five years been continuously and are you now in good health? Yes."

"Have you now, or have you ever had, or ever been told that you have, tuberculosis of lungs or any part of the body, spitting of blood, high blood pressure, heart trouble, diabetes, disease of brain or nervous system, paralysis, epilepsy, syphilis, cancer or tumor, stomach or intestinal ulcer? None."

"Have you ever undergone any operation, or have you ever been under observation or treatment in any hospital or sanitarium? No."

"Have you lost any time from work through illness during the last five years? No."

"State below each ailment, disease, impaired condition of body or mind, surgical operation, or injury, which you have had within the past five years, and the name of every physician, or practitioner, if any, whom you have consulted or who treated you. None."

The application also contained the following affirmations, representations and agreements: "On behalf of myself and of every person who shall have or claim any interest in any insurance made hereunder, I declare that I have carefully read each and all of the above answers, that they are each written as made by me, and that each of them is full, complete and true, and agree that the Company believing them to be true shall rely and act upon them."

The insured had not been continuously in good health within the five years preceding the date of his application. He had

consulted a physician at Raton and upon the advice of such physician had been confined in a hospital at La Junta, Colorado, during the entire period from August 7th to August 27th, in the year 1934, where, and through which period, he was under treatment for gastro entritis and other ailments; and, again, on the advice of his physician, he was confined in the same hospital during the entire period from August 27th to October 9th, in the year 1935. Deceased was likewise again during all this second period undergoing treatment for gastro entritis. In addition, he suffered from and was treated for pneumonia in the year of 1932. Thus the insured did in fact suffer from illnesses and lose time from work on account thereof within five years prior to the date of his application.

Several assignments of error are presented, but the principal ones may be embraced in this simple group: First, defendant challenges the legal sufficiency of plaintiff's pleading to sustain recovery; Second, the court erred in holding that the insured's truthful answers were given in good faith, without knowledge that false answers were written down and that the insured was not a participant in and did not know of the fraud, and that the judgment is without substantial evidence for its support.

Defendant points out that one distinctive feature of the case at bar is that the fraud practiced by the agent as claimed by plaintiff was against the company, his principal, and not against the insured who stood to profit if the fraud should remain undiscovered for two years; that the deceased was an uninsurable risk and that by a rescission of the policy and denial of recovery thereupon, he loses nothing which he was ever entitled to have and full justice will be done, citing New York Life Insurance Co. v. Fletcher, 117 U.S. 519, 6 S.Ct. 837, 29 L.Ed. 934.

Defendant urges then that we appraise the situation as different from one where a fraud practiced is upon the insured. Of course in such cases, defendant points out, the principal should bear the responsibility through imputation of the agent's knowledge to such principal. This is in line with Vermont Farm Machinery Co. v. Ash, 23 N.M. 647, 170 P. 741; Griffith v. Tierney, 34 N.M. 387, 281 P. 461, cited by plaintiff; and, likewise, is different from a case where by the agent's fraud a different policy from that contracted for has been foisted upon the insured (Summers v. Alexander, 30 Okl. 198, 120 P. 601, 38 L.R.A.,N.S., 787), or where the agent assumes to interpret the questions and to advise the applicant of the propriety or necessity of certain kinds of answers. Then, of course, it must be taken as an interpretation of the questions and answers by the company itself. Continental Life Ins. Co. v. Chamberlain, 132 U.S. 304, 10 S.Ct. 87, 33 L.Ed. 341; Northern Assurance Co. of Michigan v. Kelly, 217 Mich. 1, 185 N.W. 782.

Counsel for plaintiff relies upon the case of Gallegos v. Kansas City Life Ins. Co.,

34 N.M. 579, 286 P. 420, as being almost decisive of the issue here presented. There is a difference in facts involved there which clearly distinguishes that case from the one at bar.

Defendant relies upon the leading case of New York Life Insurance Co. v. Fletcher, 117 U.S. 519, 6 S.Ct. 837, 29 L. Ed. 934, discussed by us in the Gallegos case, but not disapproved as plaintiff claims. But, regardless of any disapproval of the principles laid down in the Fletcher case, if that could be the ultimate appraisal of our treatment thereof, defendant says it should not influence a decision upon the one point which, resolved as it favors it, would afford plaintiff no relief in any event. Defendant does not ask, necessarily, for the statement by this court of a rule as broad as would be required if we determined that, as a matter of law, the insured must be held to the duty of reading at the time, the application which he signs. A decision in its favor, under the circumstances of this case, would not require it. Defendant likewise has no quarrel with the Gallegos decision, and would have us follow it; but it would not approve the interpretation with which plaintiff endeavors to clothe that decision. Defendant appraises the rule announced in the Gallegos case as amounting simply to this: "Where the insured neither states anything falsely nor fails to read what he signs, and where no responsibility or complicity in the fraud practiced upon the insurer attaches to the insured, he is not in duty bound to read the policy, or the attached application when delivered."

That, defendant claims, is as broad and inclusive a statement of the rule as anything we there decided would support. We know there is a difference between the Gallegos case and the one now considered, which easily distinguishes the two; but whether this difference persuades in favor of a different result is the question.

In the Gallegos case there was presented a very flagrant case of fraud practiced by the agent in substituting for the real application which the insured had read and signed, the one which he, the agent, had himself fabricated and to which he had forged the applicant's signature. In addition to this, the agent submitted to the company a favorable but false report upon a medical examination which never took place. The insured knew nothing of these frauds practiced by the agent. He read the true application which he signed, at the time he signed it, but he did not read the copy of the application attached to the policy which was thereafter delivered to him. This, we held, he was not required to do under the circumstances of that case. We distinguished that from the Fletcher case and others approving a like rule that it was negligence not to read the application copy attached to the policy with the following observation [34 N.M. 579, 286 P. 421]: "In the case at bar there was no *consciousness of a previous negligence.* It is not contended that the assured stated anything falsely or *failed to read what she*

*signed.* Not the slightest responsibility or complicity in the fraudulent transaction attaches to her. *In such a case* we cannot hold that there was any duty upon her when the policy was delivered [to her] to read it or the attached application. * * *" (italics ours)

We did not fail to further observe in discussing the Fletcher case, which we held not helpful as a guide in the Gallegos case then under discussion, that in the Fletcher case the court was confronted with the question of whether the insured, having been negligent in not reading the application at the time of signing, should not be held to the duty of at least reading the policy with the application attached when it was delivered to him, and held that such duty did rest upon him. We had a different situation confronting us in the Gallegos case, and so stated. The Gallegos case, therefore, was there distinguishable as it is here.

Whether we should approve the reason and follow the holding in the Fletcher case and others of like holding, we shall now determine. The issue is quite clearly presented.

Counsel for plaintiff and defendant alike, in able briefs, go to some pains to collect and value their respective authorities for weight and logic. These are numerous. It is obvious that there is a clear and somewhat perplexing division of authority upon the question of what duty rests upon the insured to read before signing a standard form application for life insurance. There is likewise a division, quite as marked, if not so perplexing, upon the question of whether a duty rests upon the insured to read the application where a copy is attached to his policy thereafter delivered, within a reasonable time, absent excusing circumstances, and particularly, as in the case before us, where he had failed to read the application at the time of signing.

Defendant urges upon us consideration of whether the weight of authority does not sustain its position that, *absent excusing circumstances,* a duty rests upon the insured to read the application in the first place, and before signing. But, it points out that, under the circumstances of the case before us, it need not invoke our declaration of so broad a statement of the rule. The insurer argues that it can rest upon that abundance of authority which holds that, where the insured has, negligently or otherwise, failed to read the application at the time of signing, he is, under the weight of authority, and he ought to be as a matter of requiring conduct comporting with fair dealing and common sense, compelled to at least examine the policy to which a copy of his application is attached within a reasonable time after delivery.

If we could agree with defendant as to this last statement we would need to go no further in expressing our opinion upon, or appraising authorities under, the other and broader point.

It is of interest to notice some of the late cases, a few of them, incidentally, in-

volving a broader question since there was no attached copy of the application and therefore no second opportunity afforded to examine the application on return of the policy. See New York Life Ins. Co. v. Stewart, 5 Cir., 1934, 69 F.2d 957; Adamos v. New York Life Ins. Co., D.C. 1937, 22 F.Supp. 162, affirmed in 1938, 3 Cir., 94 F.2d 943; Metropolitan Life Ins. Co. v. Samis, 1937, 172 Md. 517, 192 A. 335; Perry v. Continental Ins. Co., 1934, 178 Wash. 24, 33 P.2d 661; Commercial Casualty Ins. Co. v. Schmidt, 1934, 166 Md. 562, 171 A. 725; Shaner v. West Coast Life Ins. Co., 10 Cir., 1934, 73 F.2d 681; Rockford Life Ins. Co. v. Tschiedel, Tex. Civ.App., 1933, 61 S.W.2d 536; Brady Mut. Life Ins. Association v. Pfiester, Tex. Civ.App., 1938, 113 S.W.2d 268; Metropolitan Life Ins. Co. v. Alterovitz, 1938, 214 Ind. 186, 14 N.E.2d 570, 117 A.L.R. 770. See notes at page 790 of this last-mentioned text, supplementing annotations in 81 A.L. R. 833, and also 57 L.R.A. 318.

Doubtless, under the later decisions in the majority of the jurisdictions, and with rather persuasive reason, the courts do hold the insured to the duty of reading the policy with application attached under conditions such as ·we have presented here, where the application was not read when signed.

Counsel·for defendant cite us to decisions from several separate jurisdictions, generally supporting this rule. These are in addition to the federal decisions which are in accord with the holding in the Fletcher case, supra. See, also, Massachusetts Protective Association v. Turner, 171 Okl. 14, 41 P.2d 689. Probably the more recent decisions do preponderate somewhat in favor of defendant's theory. Of course, cases holding the insured to the greater duty of reading also before signing his application, and which represent a minority view, we will assume, a fortiori, would require of the insured that he read the attached application ·after delivery of the policy, if not read before.

It was said in the case of Metropolitan Life Ins. Co. v. Alterovitz, supra, that the insured who for eight months prior to death held a life insurance policy embodying a copy of his application is chargeable with knowledge of the incorrectness of answers set down by the agents though truthfully answered by the insured; that the contract of insurance is controlled by substantially the same rules as any other contract.

The writer of that opinion goes to some pains to point out that prior to the adoption by New York of a statute requiring endorsement upon or attachment to all policies of a copy of the application of the insured, the rule there was as laid down by the theretofore leading case of Sternaman v. Metropolitan Life Ins. Co., 170 N.Y. 13, 62 N.E. 763, 57 L.R.A. 318, 88 Am.St.Rep. 625, which supports plaintiff's position here, and upon which he would rely. The holding in the Sternaman case was to the effect that the insurer will be bound by the true answers given by the

applicant, though the agent of the company, through fraud or otherwise, writes down erroneous ones. The theory being the one which is relied upon generally by other cases of like holding, viz., that it would be a fraud upon the insured for the insurer to accept pay for a policy which it, through its own agent, knew was voidable when delivered.

Now comes to New York the conventional statutory regulation and requirement, and subsequent decisions, and the writer of the Alterovitz opinion points out that the Sternaman case is no longer authority upon the question and likewise points to Indiana's statute of 1909 containing like provisions to that of New York in this respect, and which is substantially identical with our own. This Indiana court, in the Alterovitz case, supra [214 Ind. 186, 14 N. E.2d 574, 117 A.L.R. 770], quotes approvingly from a later New York case (Minsker), hereinafter referred to, where it is said: "Prior to the enactment, it was not necessary to make the application a part of the policy, but it might be embodied therein by reference merely. When this was done, the applicant had no opportunity to read over the application when the policy was returned to him to ascertain whether or not the answers were truthfully recorded therein, but now in every life insurance policy when returned to the insured the application is a part of the policy and he has an opportunity to examine and read the same, and, if there are any errors in the answers, he may call the attention of the company to them and have them corrected. He may know all of its terms by reading it or having it read to him. He has two opportunities to read the application and to know if the answers are correctly written, (1) when it is made, and (2) when it is returned with the policy.

The New York Court of Appeals was among the first to note and appraise this statutory regulation and requirement that a copy of the application, which is made a part of the contract, be attached to the policy, as being intended, and sufficient, to charge the insured with knowledge of the contents of the application he had signed. See case of Minsker v. John Hancock Mutual Life Ins. Co., 254 N.Y. 333, 173 N.E. 4, 81 A.L.R. 829.

Our statute has a provision, common to most states, requiring, among other things, that the policy shall contain: "A provision that either the policy itself or the policy and the application therefor shall constitute the entire contract between the parties; Provided, however, that if the application is a part of the contract a copy of same must be indorsed thereon or attached thereto." Section 71-161, N.M.Comp.Laws 1929.

There is also the further provision giving the effect of representations instead of warranties to statements of the insured, in the absence of fraud, and providing that no statement may avoid the policy unless it be contained in the written application indorsed upon or attached to the policy itself. We likewise have a statute, common to many other states, providing the

agent of the company, "in any controversy between the insured or his beneficiary and the company", will be held to be the agent of the company issuing the insurance solicited or applied for. Sec. 71-141, N.M. Comp.Laws 1929.

Counsel for defendant urges upon us in able briefs and argument, a consideration of the fact that there must lie behind the many legislative safeguards, including this quite uniform legislation confining representations and warranties to written statements which, when embodied in or attached to the policy become a part thereof, some sound public policy.

We know that the books are filled with cases involving fraudulent claims against insurance companies from the earliest days; and, while the ingenuity of the evil, though clever, mind has been at times sorely taxed to do so, it has been, nevertheless, reasonably successful in finding some new avenue of escape for the dishonest claimant when the old ones have been closed. Insurance companies, in the meantime, have not themselves been without fault. They likewise, perhaps, in self-defense, usually, and yet, without such justification at times, have contrived by all the arts of speech and script to take or hold an advantage not fairly theirs.

A careful survey of the insurance cases coming before the state and federal courts of the last half century will reveal that a very large proportion of them are burdened with that ugly question of fraud on the part of the claimant or the insurer, in

some form or other. This condition has presented an alarming challenge to our legislatures and our courts.

We approach a decision of this important question, however, without misgivings as to which of the two courses or paths, now clearly open and well marked, we should follow, seeking compatibility with justice, logic and reason; though it may be true that, according to the weight of authority, as measured by mere numbers, we may possibly have followed a minority view.

The statement is found in many texts and later cases to the effect that the courts which support the view that parol testimony will be rejected to uncover mistake, or discover fraud (to which the insured was not a party) in a policy of insurance not read by him, are clearly in the minority. That is doubtless true, if the reference is to the reading of questions and answers at the time of making and signing the application. We doubt whether that would be an accurate appraisal of the authority, as to numbers, if we consider the statement as referring to such reading *after* delivery of the policy, and under circumstances such as we are now considering. The weight of recent authority, at least, would be to the contrary, doubtless, as defendant contends.

It is argued that we need not feel definitely committed by what we have heretofore said, to either course. It might be contended, however, with some reason, that in the Gallegos case, supra, we did clearly indicate that in cases of this kind

the insurer could not escape the fraud of its agent unless the insured, by act or through neglect of which he was conscious, aided in the fraud. The language there used indicated a fairly liberal policy in favor of the insured.

It may also be said that we have at least shown a preference for the doctrine contended for by plaintiff, when in Douglass v. Mutual Ben. Health & Accident Ass'n, 42 N.M. 190, 76 P.2d 453, we quoted with approval certain language from Pfiester v. Missouri State Life Ins. Co., 85 Kan. 97, 116 P. 245, 247. The Kansas court said, in appraising the claim of the insurance company which was relying upon passive negligence on the part of the insured, and likewise in appraising the claim of the insured who was setting up the fraud of the insurer's agent: "Few persons solicited to take policies understand the subject of insurance or the rules of law governing the negotiations, and they have no voice in dictating the terms of what is called the contract. * * * In writing the application, the agent does what the company sent him out to do. He negotiates for the company, asks questions for the company, writes down answers for the company, and makes the return for the company. It is not carelessness or imprudence in fact, as people in general understand those terms, for the applicant to take it for granted that the agent will accurately and truthfully set down the result of the negotiations. If he fail to do so, good sense and common justice regard the company as responsible, and not the in-

surer. The subject, therefore, is sui generis, and the rules of a legal system devised to govern the formation of ordinary contracts between man and man cannot be mechanically applied to it. * * *"

Mr. Justice Brice, the writer of the opinion in the Douglass case, in speaking further upon the question there before the court, which involved the authority of a general agent to bind the insurance company by oral representations or contract as to when an insurance policy should be in force, quoted with approval language relied upon in Union Mutual Life Ins. Co. v. Wilkinson, 13 Wall. 222, 234, 20 L.Ed. 617, to the effect that interested or officious zeal of insurance agents in the wish to outbid each other in the procuring of customers, "not infrequently mislead the insured, by a false or erroneous statement, of what the application should contain, or, taking the preparation of it into their own hands, procure his signature by an assurance that it is properly drawn, and will meet the requirements of the policy," and pointing out that when this course is pursued, the better opinion seems to be that the "description of the risk should, though nominally proceeding from the insured, be regarded as the act of the insurers." [42 N.M. 190, 76 P.2d 458.]

In a case involving fraud, but not relating to insurance, we held that one signing a contract without reading it, "where the party seeking enforcement practiced fraud or deception in order to induce the other to sign," is not estopped from set-

ting up the true agreement. Vermont Farm Mach. Co. v. Ash, 23 N.M. 647, 170 P. 741, 742. Such rule, we said, was supported by the great weight of authority.

Cooley's Briefs on Insurance, 2d Ed., vol. 5, p. 4135, questions the principles laid down by the Fletcher case, supra, as being supported by the weight of authority, and says that: "the mere failure of the insured to inform himself of the insertion of false answers in the application which has been filled out by the agent of the insurer does not convict him of a lack of good faith."

This glaring inconsistency of authority upon the question before us rests upon the one single issue, viz., whether an insurance policy or a contract therefor, is not so distinctive in the field of commercial intercourse that a somewhat different rule from that which governs contracts and agency generally, governs.

Some courts have approached the question somewhat apologetically when resolving the question of permitting to stand such frauds against the insurer, and when favoring logic and reason that did such violence to written contract relations, as generally understood. Others have cheerfully accepted the challenge, and with vigorous language met the charge that they are unfairly applying one set of rules to the government of insurance contracts and a different set for most other commercial undertakings. Germania Life Ins. Co. v. Lunkenheimer, 127 Ind. 536, 538, 26 N.E. 1082; Continental Ins. Co. v. Pierce, 39

Kan. 396, 18 P. 291, 7 Am.St.Rep. 557; Busboom v. Capital F. Ins. Co., 111 Neb. 855, 197 N.W. 957; American Life Ins. Co. v. Buntyn, 1933, 227 Ala. 32, 148 So. 617.

It was said in the Lunkenheimer case, supra [127 Ind. 536, 26 N.E. 1084]: "Nor can it be said that the assured, who has fully, frankly, truthfully, and in good faith answered all the required questions, is guilty of negligence in signing, without reading, the application which is thereupon prepared by the agent. He is justified in assuming that the agent has, with equal good faith, truthfully recorded the answers given. * * * Here one party to the contract states a truth, while the agent of the other party, pretending to record that truth, deliberately records a falsehood instead. When the principal of the dishonest agent is sued, he will not be permitted to escape liability simply because of his own agent's dishonesty. * * * Nor is it material in this case whether the untruthful answer was thus written from dishonest motives or merely through mistake. The party whose act it was cannot complain that the other party to the contract was guilty of negligence in trusting either his honesty or his accuracy."

Many of the cases, particularly the more recent ones, as we point out, have seized upon the statutory requirement that a copy of the application be embodied in or attached to the policy, as evidence of a legislative intention to aid the courts in meeting such situations, and combatting the evils

often present, where the insured or his beneficiaries rely upon fraud of the agent in failure to correctly set down and transmit to the insurer the answers made by the insured.

However, should we say that such legislation has thus cured the evil sought to be reached, or effectively enough closed the door to the possibilities of fraud upon the part of the agent of the company?

It must be conceded · that the great majority of the courts hold that, absent facts or circumstances which would show or impute bad faith or fraudulent participation by him, the insured is not precluded from showing that he made true answers to the questions in the application blank, though he thereafter signed the completed document without reading it. Summed up into a few words, the reason for this may be said to be, that the agent soliciting is the agent of the company, and ordinarily, one in whom the applicant for insurance had a right to repose confidence. Although not decided in the Gallegos case, it displays a leaning against the doctrine of the Fletcher case from the United States Supreme Court on the point at issue. Taking the Gallegos case, then, as strongly persuasive that the active fraud of the agent in supplying false for correct answers in the application, outweighs the mere negligent omission of the insured to discover the fraud by reading over the application when the agent has completed same, we here have only to decide the further question whether placing in the scale against

the agent's active fraud the second omission on insured's part, viz., the failure to read the copy of the application attached to the policy when delivered, causes the scales to balance the other way. In other words, as fixing rights, which should be of greater force, two acts of innocent, even if negligent, omission, or, as found in effect ·by the trial court, one act of designed and purposed fraud? We favor the line of decisions whose effect is to hold an agent's positive fraud outweighs two negligent omissions of the insured to discover it where such omissions are so identical in kind and so related in time as is the case here.

Doubtless much of the reason which favors overlooking the insured's clear negligence in failing to read what he has signed in connection with such application, is bottomed upon the theory that he had no reason to suspect the agent of dishonest conduct—that he had a right to require that the company which put him forward would at least not be permitted to question his honesty or rely upon his frauds. In other words, the company would not be heard to say to the insured: "You have misplaced your trust in *our* (the company's) agent, and, while *we* will escape the disappointments and losses occasioned thereby, *you* cannot. Your assumption that we would have in our employ only such agents as are trustworthy and honest is incorrect as we must now for the first time advise you."

Now, can it be said that, if and since the law is that the insured will be excused

of his one negligent act of failing to read what he has signed at the time of its execution, because, measured by the positive fraudulent act of the agent, the company cannot rely upon it, yet upon this second negligent act of the insured (if such act can in fact be called negligent), in failing to read the application as copied in the policy when returned to him, he will be bound by the answers fraudulently written down? We think not.

We doubt the soundness, and must question the reasoning, of any rule which would not, under ordinary circumstances, require a reading of the application at the time it is signed by the insured, and yet would deny to him the right to continue to rely upon the integrity of the insurer's agent, unless the insured's sense of precaution and feeling of suspicion should stimulate him to an early reading of the policy, in all its parts, after receipt. The trial court correctly resolved this issue, and there was no error.

By an additional assignment defendant questions the correctness of the court's findings to the effect that plaintiff's insured gave true answers in good faith, and without knowledge that false answers were written down, and that he did not participate in the fraud charged, if any.

We have examined the testimony relied upon by defendant to support such challenge, and upon which the finding rests, and hold the assignment without merit. It is true, the testimony upon which the finding must rely for its support is not as

satisfactory as could be desired, yet, in view of the liberality with which we view evidence in support of the findings and judgment of a trial court, we cannot say there is not sufficient, or substantial, evidence to support such finding.

For the reasons given, the judgment will be affirmed and it is so ordered.

BICKLEY, C. J., and SADLER, BRICE, and ZINN, JJ., concur.